# In The United States Court of Appeals For The Third Circuit

---

Appeal No. 24-1498

---

VINCENT SORACE; JOSEPH YERTY; TAMMY YERTY; JAMES ZARONSKY; LINDA ZARONSKY; VIKTOR STEVENSON; ASHLEY YATES; KIMBERLY SOLOMON-ROBINSON, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS,

Plaintiffs/Appellees,

v.

WELLS FARGO BANK, N.A.,

Defendant/Appellee,

v.

JENNIFER LYNN HUMMEL and SHAWN DAVID HUMMEL,

Objectors/Appellants

---

## APPELLANTS' BRIEF

---

Appeal from February 15, 2024, Order and Memorandum Opinion of the United States District Court for the Eastern District of Pennsylvania (Case No. 20-4318) (Pappert, J.)

---

ROBLETO KURUCE, PLLC
6101 Penn Ave., Ste. 201
Pittsburgh, PA 15206
Tel:  (412) 925-8194
Fax:  (412) 346-1035

Aurelius P. Robleto, Esq.
PA ID No. 94633
Renee M. Kuruce, Esq.
PA ID No. 314691

# **TABLE OF CONTENTS**

Table of Contents ....................................................................i

Table of Authorities ..............................................................iii

Statement of Jurisdiction .........................................................1

Statement of the Issues ...........................................................2

Statement of Related Cases ......................................................4

Concise Statement of the Case ..................................................5

Summary of the Argument........................................................8

Argument................................................................................11

   I.     The District Court Erred by Failing to Closely
          Scrutinize the Parties' "Clear Sailing" Side Agreement...................11

   II.    The District Court Erred by Approving
          Unconscionably Broad Release Provisions ........................................17

         (a) The Release Provisions at Issue .........................................17

         (b) Legal Requirements for Limitation
            of Release Provisions ...........................................................19

         (c) The Hummels' Claims Illustrate the
            Overbreadth of the Release ..................................................22

   III.   The District Court Erred in Permitting Wells
          Fargo to Issue Tax Forms Evidencing Forgiveness
          or Cancellation of Debts That Were to Have Been
          Fully Compromised under the Settlement ........................................23

   IV.   The District Court Erred in Awarding the Sorace
          Plaintiffs' Counsel Excessive Attorneys' Fees ................................28

   V.    The District Court Erred in Approving an

Insufficiently Funded Settlement ........................................ 35

    (a) Analysis of the Deficiency Balance Compromise ............. 37

    (b) The Common Fund ............................................ 39

VI.   The District Court Erred by Permitting the Sorace
      Plaintiffs' Counsel to Withdraw the Timely, Written
      Objection of a *Pro Se* Class Member ................................. 41

Conclusion ................................................................ 43

Combined Certifications ................................................. 44

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ............................12, 13

*Antista v. Fin. Recovery Servs.*, No. 2:17-cv-3567
(WJM), 2017 U.S. Dist. LEXIS 213609 ..........................................24

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ......................1, 32, 40

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ..............................29

*United States ex rel. Bogart v. King Pharm.*,
493 F.3d 323 (3d Cir. 2007) ......................................................34

*Brennan v. Community Bank, N.A.*, M.D. Pa.,
case no. 3:13-cv-02939-MEM ....................................................22

*Devlin v. Scardelletti*, 536 U.S. 1 (2002) .........................................1

*Drazin v. Horizon Blue Cross Blue Shield of N.J., Inc.*,
528 F. App'x 211 (3d Cir. 2013). ................................................34

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ................................34

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) ..................................................12, 35

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
934 F.3d 316 (3d Cir. 2019) ......................................................18

*Grimes v. Vitalink Commc'ns Corp.*,
17 F.3d 1553 (3d Cir. 1994) ................................................19, 20

*Grunin v. International House of Pancakes*,
513 F.2d 114 (8th Cir.) ............................................................35

*Grunin v. International House of Pancakes*, 423 U.S. 864 (1975) ..................35

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) ..................29

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)....................................39-40

*Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481 (3d Cir. 2017)...........................22

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ...........22

*Int'l Union, United Auto., etc. v. Mack Trucks, Inc.*,
820 F.2d 91, 95 (3d Cir. 1987) ..........................................................35

*Int'l Union, etc. v. Mack Trucks, Inc.*, 499 U.S. 921 (1991) .............................35

*Kelly v. Santander Consumer, USA*,
E.D. Pa., case no. 2:20-cv-03698-MMB ..........................................27

*Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co.
Am. Sales Practice Litig. Agent Actions)*,
148 F.3d 283 (3d Cir. 1998) ...........................................................28, 29, 34,
35

*In re NFL Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) ...........................................................11

*In re N.J. Tax Sales Certificates Antitrust Litig*, Civil Action No.
12-1893 (MAS) (TJB), 2016 U.S. Dist. LEXIS 137153
(D.N.J. Sep. 30, 2016)....................................................................39

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012).........................22

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) ....................................11

*In re Payment Card Interchange Fee & Merch. Disc.
Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016)..................................14, 31,
32

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
261 F.3d 355 (3d Cir. 2001) ...........................................................16, 19

*In re Rite Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005) ...............................................................13, 15, 27

*Rood v. Commissioner*, Docket No. 3366-94.,
1996 Tax Ct. Memo LEXIS 262 (T.C. May 29, 1996) ..................................24

*Scott v. Bimbo Bakeries United States, Inc.*,
No. 10-3154, 2015 U.S. Dist. LEXIS 167317
(E.D. Pa. Dec. 15, 2015) ...................................................................19, 20

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011)....................................28, 40

*TBK Partners, Ltd. v. W. Union Corp.*,
675 F.2d 456, 462 (2d Cir. 1982 .......................................................19

*Shull v. Synchrony Bank*, No. 1:19-cv-00715,
2020 U.S. Dist. LEXIS 52365 (M.D. Pa. Mar. 26, 2020) .............................24

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ...........13

*In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712 (3d Cir. 2023) .......................*passim*

*Welch & Forbes, Inc. v. Cendant Corp.
(In re Cendant Corp. Prides Litig.)*, 243 F.3d 722 (3d Cir. 2001)....................27

*Zarin v. Commissioner*, 916 F.2d 110 (3d Cir. 1990) ...................................23, 24,
25, 26,
27, 29

# Other Authority

### *Statutes*

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1332 ............................................................................1

Cal. Civ. Code § 1542 ....................................................................18

### *Rules*

Fed. R. Civ. P. 23 ....................................................................*passim*

### *Other*

Moore's Federal Practice,
Manual for Complex Litigation (Third) § 24.121 ...........................29

## **Statement of Jurisdiction**

The district court had original jurisdiction over these proceedings pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1453 because minimum diversity exists, the aggregate number of members of the putative class exceeded 100, and the aggregate amount in controversy exceeded $5 million.  Appx. 64-79.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the February 15, 2024, decision constituted a final decision of a district court of the United States.  The decision overruled the appellants' objections, granted the plaintiffs' motions for certification of a settlement class, final approval of a settlement agreement, and award of requested attorneys' fees.  Appx. 4-34. Appellants filed a timely notice of appeal from that decision on March 15, 2024. Appx. 1-3.  The appellants are class members who objected to approval of the terms of settlement and proposed attorneys' fees.  Appx. 36-42.  Consequently, they have standing to appeal a final decision certifying a settlement class and approving compensation.  *Devlin v. Scardelletti*, 536 U.S. 1, 14, (2002) (holding "that nonnamed class members… who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening."); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 169 n.3 (3d Cir. 2013) (same).

## **Statement of the Issues**

1.    ***The "Clear Sailing" Clause.***  Whether the district court erred by failing to closely scrutinize the parties' "clear sailing" side deal, when it approved the proposed settlement agreement and determined that the proposed settlement class met the requirements of Federal Rule of Civil Procedure 23.

(Raised at Appx. 582-84; Ruled on at Appx. 27-28.)

2.    ***Sufficiency of Settlement Fund.***  Whether the district court erred by approving a settlement under which the defendant would pay no more than $15 million, when it approved the proposed settlement agreement and determined that the proposed settlement class met the requirements of Federal Rule of Civil Procedure 23.

(Raised at Appx. 578-80; Ruled on at Appx. 26.)

3.    ***Propriety of Fee Award.***  Whether the district court erred by approving the plaintiffs' attorneys' fee request in the amount of $6 million, constituting 40% of the common fund, when it approved the proposed settlement agreement and determined that the proposed settlement class met the requirements of Federal Rule of Civil Procedure 23.

(Raised at Appx. 580-82; Ruled on at Appx. 27-33.)

4.    ***Issuance of Tax Forms 1099-C.***  Whether the district court erred by approving the proposed settlement agreement and determining that the proposed

settlement class met the requirements of Federal Rule of Civil Procedure 23 when the terms of the agreement did not permit class members to refuse the defendant's full compromise of disputed deficiency balances, while simultaneously providing that Wells Fargo would issue forms 1099-C for any compromised, disputed deficiency balance claim exceeding $600.

(Raised at Appx. 576-78; Ruled on at Appx. 24-26.)

5. ***Breadth of Release.*** Whether the district court erred by approving the proposed settlement agreement and determining that the proposed settlement class met the requirements of Federal Rule of Civil Procedure 23, considering that the settlement included a gratuitous and overbroad release of claims against the defendant, including the objectors' claims against the defendant, which claims are distinct from any claims presented by the plaintiffs, not duplicative of those claims, and for which class members would receive no remedy or compensation.

(Raised at Appx. 570-76; Ruled on at Appx. 23-24.)

6. ***Withdrawal of the Brooks-Wade Objection.*** Whether the district court erred by denying the objectors' opposition to the purported withdrawal of the objection of Celeste Brooks-Wade to the proposed settlement agreement, when it approved the proposed settlement agreement and determined that the proposed settlement class met the requirements of Federal Rule of Civil Procedure 23.

(Raised at Appx. 799-802; Ruled on at Appx. 21.)

## **Statement of Related Cases**

This case has not previously been before this Court.  The appellants are aware of the following related cases:

1.    *McDonald v. Wells Fargo Bank, N.A.*, 374 F. Supp. 3d 462, 470 (W.D. Pa. 2019).  The Sorace plaintiffs, with the exception of Kimberly Solomon-Robinson, sought unsuccessfully to intervene in this related case in 2019.

2.    *Hummel v. Sorace*, W.D. Pa., case no. 2:24-mc-00056-RJC.   In this related case, the Appellants successfully quashed the Sorace plaintiffs' foreign deposition subpoenas.

3.    *Hummel v. Wells Fargo*, W.D. Pa., case no. 2:23-cv-02002.   In this related case, the Appellants alleged class action claims against Wells Fargo that do not arise from the identical factual predicates as the Sorace class action.

4.    *In re: Hummel*, Bankr. W.D. Pa., case no. 2:19-bk-24826.  This related case was the appellants' chapter 13 bankruptcy, commenced on December 18, 2019, and dismissed without prejudice on May 6, 2024.

## Concise Statement of the Case

On July 7, 2020, the Sorace plaintiffs[1] filed a class action complaint in in the Court of Common Pleas of Philadelphia County, Pennsylvania (case no. 200700334). Appx. 63-137.  The complaint alleged claims against Wells Fargo for violations of the Uniform Commercial Code and the Pennsylvania Motor Vehicle Sales Finance Act based on its systemic failure to comply with the statutory requirements relating to consumer disclosure notices following vehicle repossessions.  *Id.*

On September 2, 2020, Wells Fargo removed the case to federal court.  Appx. 63-81.  On September 1, 2021, the defendant moved to dismiss the Sorace plaintiffs' second amended complaint.  Appx. 973.  The parties fully briefed their arguments on the motion to dismiss but, on November 16, 2021, they jointly moved to stay the case pending mediation.  *Id.*

After just two mediation sessions, while the pleadings remained open, and with no formal exchange of discovery, the Sorace plaintiffs submitted their certification motion on May 31, 2023.  Appx. 267-455.  Under the terms of that

---

[1] In this brief, the terms below shall be ascribed the following definitions:

"***Hummels***" means the appellant-objectors, Jennifer Lynn Hummel and Shawn David Hummel, Sr.;

"***Sorace plaintiffs***" means the appellee-plaintiffs, Vincent Sorace, Joseph Yerty, Tammy Yerty, James Zaronsky, Linda Zaronsky, Viktor Stevenson, Ashley Yates, and Kimberly Solomon-Robinson; and

"***Wells Fargo***" means the appellee-defendant, Wells Fargo Bank, N.A.

proposed settlement, Wells Fargo would pay $15 million into a common fund. Appx. 326. The defendant also agreed to *fully compromise* the class members' disputed deficiency balances (importantly, Wells Fargo did not *forgive* the claims, it agreed to *compromise* them to $0). Consistent with that compromise, the bank agreed to refund all class members' payments on the fully compromised deficiency balance claims. Appx. 344-45. The defendant further agreed to request deletion of reporting of the tradelines for class members' accounts. Appx. 348-50.

The settlement agreement provided a mechanism for class members to opt-out of the "tradeline deletion" benefit. Appx. 368-70. However, class members had no way to decline the compromise of their disputed deficiency balances short of fully opting out of the settlement. *Id.* And, despite that the deficiency balances were to be fully compromised (and not forgiven), Wells Fargo would nevertheless issue forms 1099-C to class members. Appx. 351.

On September 7, 2023, the district court denied the Hummels' request to intervene. Appx. Accordingly, they submitted their timely objections to the Sorace plaintiffs' certification motion. Appx. 560-636. Celeste Brooks-Wade, an unnamed class member, also timely objected, through her December 20, 2023, letter. Brooks-Wade carefully detailed the particulars of her repossession experience and explained that she "would like [them] to be considered when evaluating the class action lawsuit." Appx. 636-48. But, on December 29, 2023, the Sorace plaintiffs' counsel

filed a document styled, "Notice of Objection (ECF 89) Withdrawal and Affidavit in Support of Settlement of Celeste Brooks-Wade." Appx. 649. On January 26, 2024, the Hummels filed their opposition to the purported withdrawal of the Brooks-Wade Objection. Appx. 799.

On January 31, 2024, the district court presided over a hearing on final approval of the settlement agreement, attorney fees and class certification. On February 12 and February 14, 2024, the Sorace plaintiffs filed various memoranda in support of the motion for final approval. Appx. 979. While the Sorace plaintiffs' attorney had promised to supply chronological, detailed statements for their services, instead he submitted non-contemporaneous, reconstructed time records—and only for *in camera* review. Appx. 28-33.

The following day, the district court approved the Sorace plaintiffs' motion for final approval of the settlement, certification of a settlement class, and attorneys' fees of $6 million. Appx. 4-35. Through that decision, the district court overruled the Objectors' objections and their opposition to the Sorace plaintiffs' withdrawal of the Brooks-Wade objection. Appx. 21.

This timely appeal followed.

## Summary of the Argument

The district court was duty bound to closely scrutinize the parties' "clear sailing" agreement before certifying a settlement class and "review the process and substance of the settlement and satisfy itself that the agreement does not indicate collusion or otherwise pose a problem." *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 725-26 (3d Cir. 2023). Had the district court conducted an appropriate *Wawa* analysis, it would have found an improper exchange of benefits between Wells Fargo and the plaintiffs' counsel to the detriment of tens of thousands of unnamed plaintiffs.

Wells Fargo's side deal with the Sorace plaintiffs' attorney meant that it couldn't object to any request for counsel fees, up to $6 million. In exchange for the defendant's agreement not to object to a request for attorneys' fees, the plaintiffs' counsel improvidently conceded to provisions disfavoring the unnamed plaintiffs. For example, despite having objected to the issuance of forms 1099-C under identical circumstances in another case the plaintiffs' counsel agreed that, here, Wells Fargo could notify the IRS that it had *forgiven* those class members' indebtedness for post-sale, deficiency balance claims—when, in fact, it had agreed to *fully compromise* them. But—as the Sorace plaintiffs' attorney was fully aware— the compromise of a disputed debt differs from debt forgiveness or cancellation in that, under the contested liability doctrine, former is not a taxable income realization event.

Also in exchange for the clear sailing side deal, the plaintiffs' counsel agreed to a release for Wells Fargo that is spectacularly broad.  The release would extinguish claims that were never involved in the underlying litigation—even if the defendants hadn't known of the claims—even if they would never have agreed to settle if they *had* known about them—and even if Wells Fargo knew about those claims all along.  And, as it happens, the Hummels (and other unnamed class members) hold substantial claims against Wells Fargo that are factually independent of the repossession-based claims at issue in this litigation.  Those unrelated claims should not be so quietly extinguished in exchange for a side deal benefitting only Wells Fargo and the plaintiffs' counsel.

The clear sailing side deal harmed the unnamed plaintiffs in exchange for an oversized legal fee.  This case involved practically no litigation.  The pleadings never closed, no discovery was exchanged, and not a single witness was deposed.  Instead, the proceedings were little more than window dressing for the attorneys' settlement discussions.  Nevertheless, the plaintiffs' counsel sought $6 million in attorneys' fees without producing chronological, contemporaneously maintained time records.  Under those facts, an award of 40% of a $15 million common fund is patently excessive.

A direct consequence of that excessive fee award is that the settlement fund is insufficient.  Refunding payments on the compromised deficiency balance claims

would reduce the common fund from $15 million to $8.3 million.  Appx. 320-84.  After $6 million in attorneys' fees, only $2.3 million would remain for (i) reimbursement of expenses; (ii) payment of incentive awards to the Sorace plaintiffs; (iii) settlement administration costs; and, *almost as an afterthought*, (iv) a pro rata distribution to class members.  *Id.*  In fact, the parties anticipate that pro rata distribution will be less than $100.  Further compounding those issues, the district court erred once more by permitting the plaintiffs' attorney to withdraw the timely written objection of an unrepresented class member.

Here, just as in *Wawa*, this Court should reverse the district court's decision and remand the case with appropriate instructions for further proceedings.

## Argument

The matters to be addressed in this appeal are straightforward.  The district court failed to conduct the thorough review of the parties "clear sailing" side deal, required under *Wawa*.  That error resulted in a settlement with an indefensibly broad release and inequitable tax features, and permitted excessive counsel fees to diminish the common fund so drastically that only a *di minimis* pro rata distribution would be possible.  In short, the district court improvidently certified a settlement class and awarded attorneys' fees over the Hummels' meritorious objections.

**I.    The District Court Erred by Failing to Closely Scrutinize the Parties' "Clear Sailing" Side Agreement.**

***Standard of Review.***  "The standards employed calculating attorneys' fees awards are legal questions subject to plenary review," while the awards themselves remain "within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 718 n.4 (3d Cir. 2023).

"Clear sailing" agreements are not an "automatic bar to settlement approval," but they demand careful judicial scrutiny.  *Wawa,* 85 F.4th 712, at \*19. And there is an unmistakable need for that heightened level of review:

> The concern with a clear sailing provision is collusion. The defendant is indifferent to the allocation of its liability between the class and counsel; all that matters is the total liability. To forgo the opportunity to object

> to the fee award, the defendant will presumably want something in return because it is giving up the chance to reduce its overall liability. We thus might fear that class counsel has given away something of value to the class in return for the defendant's agreement not to contest a fee request below a certain level.

*In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 447 (3d Cir. 2016). The risk exposed in the *NFL* case is on full display here.

Wells Fargo's goal was to secure as broad a release as possible and secure valuable tax advantages for itself. For those benefits, the bank agreed to pay $15 million—and not a penny more. *Settlement Agreement*, Appx. 350, § 3.3.6. Of course, after Wells Fargo made the settlement payment, it retained no interest the subsequent disposition of the fund. Despite having had no remaining interest in the allocation of the settlement fund to attorneys' fees, Wells Fargo's acquiescence to a clear sailing agreement remained valuable as deal leverage. The result is a proposed settlement that exalts the interests of Wells Fargo and the Sorace plaintiffs' attorneys—at the expense of the legitimate interests of the voiceless, unnamed plaintiffs.

The very reason that courts "must be on the lookout for clear sailing clauses" is that they "amount to 'agreement[s] by a settling party not to oppose a fee application up to a certain amount.'" *Wawa,* 85 F.4th 712, at *17 *citing Pearson v. NBTY, Inc.*, 772 F.3d 778, 786 (7th Cir. 2014). In this case, the "clear sailing" side deal allowed the Sorace plaintiffs' counsel to take up to $6 million and

expenses up to $100,000 without any objection from Wells Fargo.  Appx. 375, § 15.1.

On the issue of compensation, the parties' side deal pushed the edge of the envelope for compensation that the district court might approve.  Wells Fargo, in exchange, bargained to pay as little as it could for the broadest release possible and contrary-to-law tax advantages.  *Amchem Prods. v. Windsor*, 521 U.S. 591, 621-23 (1997), *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 795 (3d Cir. 1995) (collusion and inadequate prosecution are the paramount concerns in settlement certification).

The district court erred by failing to conduct a fulsome analysis of the settlement in view of the parties' "clear sailing" side deal.  While writing that it had taken a "close look" at the parties' side deal, it found that "in the context of the larger settlement," it "raise[d] no concerns."  Appx. 15.  However, the district court offered only a single sentence explaining its "close look" at the side agreement:  "This Settlement Agreement is the product of more than three years of contested litigation and two mediations before Judge Welsh, who attests that attorneys' fees were never a negotiation tool during settlement discussions."  *Id.* While the district court would briefly reference the side deal once more in its decision, when it addressed the Hummels' objection, it provided no further insight into its "close look" at the clear sailing provision.  Appx. 27-28.

The district court did not meet its obligation to closely scrutinize the parties' clear sailing side deal.  To begin with, the litigation in the district court never exited the pleadings phase and the parties exchanged no discovery and deposed no witnesses.  Appx. 970-80.  Moreover, while Judge Diane M. Welsh (ret.) should be commended for her performance as a mediator and for her well-earned reputation as an esteemed jurist—those two roles must not be conflated.  It remained the function of the district court, and not any mediator, to closely scrutinize the parties' side deal.  As this Court has recently reminded, "the mere presence of a neutral mediator… is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement."  *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 726 (3d Cir. 2023).

To emphasize the distinct roles of trial judges and the mediators, "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004).  Trial judges apply Rule 23(e) to "protect[] unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997) (internal citations omitted); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307-08 (3d Cir. 2005) ("fiduciary duty" of district

courts, collecting cases).

In contrast, mediators need not concern themselves with the interests of absent class members. To be sure, it would be difficult to overstate the value of a skilled mediator in brokering resolutions to litigation disputes. As another appeals court succinctly explained:

> But even an intense, protected, adversarial mediation, involving multiple parties, including highly respected and capable mediators and associational plaintiffs, does not compensate for the absence of independent representation. The **mission of mediators is to bring together the parties and interests that come to them. It is not their role** to advance the strongest arguments in favor of each subset of class members entitled to separate representation, or **to voice the interests of a group for which no one else is speaking.**

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 235 (2d Cir. 2016) (internal quotations omitted, emphasis added). In fact, Judge Welsh did not shy away from that distinction in her declaration to the district court, acknowledging that the district court "will need to make its own determination as to the proposed Settlement's fairness under Fed. R. Civ. P. 23(e)(2)." *Decl. of Hon. Diane M. Welsh (ret.)*, Dkt. No. 101-6, p.6, ¶ 17.

Moreover, the portion of the mediator's declaration to which the district court cited did not acknowledge the parties' clear sailing agreement. Specifically, that paragraph reads:

> At no time was an amount certain as to the attorney fees

negotiated in exchange for a concession. The amount of attorneys' fees that Class Counsel may be requesting was never used as a bargaining chip. No fixed attorney fee was determined nor agreed-to.

*Decl. of Hon. Diane M. Welsh (ret.)*, Dkt. No. 101-6, p.6, ¶ 19.

But the parties did agree to a clear sailing side deal. And even if the parties came to that agreement only after negotiating all other terms of settlement, it would not have avoided the risks that clear sailing side deals present. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 308, n.19 (3d Cir. 2005) (Fee requests "presented… with enthusiastic endorsement, or at least acquiescence, of the lawyers on both sides…" create "a situation virtually designed to conceal any problems with the settlement not in the interests of the lawyers to disclose."). The only change would have been to shift the leverage advantage from Wells Fargo to the Sorace plaintiffs' counsel. Under those circumstances, the common fund would have been fixed at $15 million and, with all other demands on the fund set in place, Wells Fargo's refusal to agree to a $6 million clear sailing side would have imperiled its tentative bargains for an overbroad release and inequitable tax treatment favorable to the bank.

For those reasons, just as in *Wawa*, this Court should "remand for closer scrutiny based on [its] refreshed guidance." *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 726 (3d Cir. 2023).

## II.   The District Court Erred by Approving Unconscionably Broad Release Provisions.

***Standard of Review.***   This Court reviews release provisions in class action settlement agreements "for an abuse of discretion, underlying questions of law receive de novo review, and factual determinations are reviewed for clear error." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 363 (3d Cir. 2001)

### (a) The Release Provisions at Issue.

The release provisions of the settlement agreement are unwarranted and fantastically broad.   Beginning with the defined term "Released Claims," the agreement provides that:

> "**Released Claims**" mean any and all claims, defenses, demands, actions, causes of action, offsets, setoffs, suits, damages, lawsuits, costs, relief for contempt, losses, attorneys' fees, expenses, or liabilities of any kind whatsoever in law or in equity, for any relief whatsoever, including monetary, sanctions or damage for contempt, injunctive, or declaratory relief, rescission, general, compensatory, special, liquidated, indirect, incidental, consequential, or punitive damages, as well as any and all claims for treble damages, statutory damages, contribution or indemnity, penalties, interest, attorneys' fees, costs, or expenses, whether a known or **Unknown Claim**, suspected or unsuspected, contingent or vested, accrued or not accrued, liquidated or unliquidated, matured or unmatured, that in any way concern, arise out of, or relate to: (1) allegations that were or could have been asserted in the Second Amended Complaint against the Released Parties… (5) the charging, payment, collection, and attempted collection of amounts relating to any Account

Appx. 334-35 § 1.38, (emphasis added).   The broad scope of those "Released Claims" is expanded dramatically by the term "Unknown Claims," which is separately defined to mean:

> "**Unknown Claims**" mean any Released Claims which any Releasor does not know or suspect to exist in his or her favor at the time of the entry of the Judgment, and which, if known by him or her might have affected his or her settlement with and release of the Releasees, or might have affected his or her decision to opt out of the Settlement Class or to object to this Settlement. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date, the Class Representatives shall expressly and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have to the fullest extent allowed by law, waived the provisions, rights, and benefits of any statute or principle of common law which provides that general releases do not extend to claims which the debtor does not know or suspect exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the creditor.... The Class Representatives acknowledge, and the Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a material term of the settlement of which this release is a part.

Appx. 338 at § 1.51 (emphasis added).  Based on those definitions, Unknown Claims are a subset of Released Claims with the distinctive characteristic that the plaintiffs are unaware of them.  But—*if they had known about them*—the Unknown Claims could have affected their decisions about whether to opt out of the class or object to the settlement. *Id.*

But the settlement agreement goes even further, requiring class members to waive all statutory protection available under California Civil Code section 1542 and all similar laws.  California Civil Code section 1542 provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Appx. 336-37, § 10.2, pp. 47-48.

In an unconvincing effort to justify that blind and practically absolute release, the plaintiffs claim that the waiver of Unknown Claims "was separately bargained for and a material term of the settlement."  *Id.*  But the claim of a separate bargain strains credulity since the financial terms of the settlement appear to leave the fund at risk of administrative insolvency while conferring significant tax advantages upon the defendant.

**(b) Legal Requirements for Limitation of Release Provisions.**

After describing a class action settlement that releases all claims for damages that did or could stem from the litigation's subject matter, this Court remarked succinctly:  "This raises a red flag."  *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 329 (3d Cir. 2019).  But even with a red flag, a class action settlement can release later claims when those released claims are "based on

the allegations underlying the claims in the settled class action." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001).

However, the "identical factual predicate doctrine" imposes a critical "limitation on a class settlement release." *Scott v. Bimbo Bakeries United States, Inc.*, No. 10-3154, 2015 U.S. Dist. LEXIS 167317, at *10-11 (E.D. Pa. Dec. 15, 2015) *citing Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994). As the *Scott* court explained:

> We [have] declined to permit the uncompensated release of claims resting on a separate factual predicate from that settled in the class action. If a judgment after trial cannot extinguish claims not asserted in [a] class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either.... [T]he heart of our concern [is] the danger that a class representative not sharing common interests with other class members [will] endeavor to obtain a better settlement by sacrificing the claims of others at no cost to themselves by throwing the others' claims "to the winds." There would be no assurance that the class representative had fully advanced the unshared claims of the class members.

*Scott v. Bimbo Bakeries United States, Inc.*, No. 10-3154, 2015 U.S. Dist. LEXIS 167317, at *11-12 (E.D. Pa. Dec. 15, 2015) *quoting TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982).

Said differently, released claims must "arise from the same nucleus of operative facts as the claims properly before" the court. *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001).  The "rule… serves the

important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action." *Id.* (internal quotations omitted); *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1564 (3d Cir. 1994) (acknowledging that courts cannot approve release of a claim "arising from a different factual predicate").

Here, the parties rely upon the notion that the release is limited to claims that relate back to class members "Accounts," a defined term linked to their vehicle loan accounts with Wells Fargo.  Appx. 329.  However, that distinction is practically meaningless since, for the clear majority of class members, their accounts are their *only* connection with Wells Fargo.  The *Scott* court addressed the same issue head-on, writing:

> The only similarity between Scott and Dando is that the Distribution Agreement established the contractual relationship between the parties. However, that does not also mean that the cases share an 'identical factual predicate.'

*Scott v. Bimbo Bakeries United States, Inc.*, No. 10-3154, 2015 U.S. Dist. LEXIS 167317, at *15 (E.D. Pa. Dec. 15, 2015)

As we will see, the identical factual predicate doctrine prevented the district court from approving the settlement.

### (c) The Hummels' Claims Illustrate the Overbreadth of the Release.

The Hummels fall within the membership parameters of the proposed settlement class, but they also hold claims against Wells Fargo for its misconduct that unrelated to the factual predicates of this litigation. Consequently, the Hummels could recover for their repossession-based claims in common with the plaintiffs in this case, but they would simultaneously release their other claims against Wells Fargo for improper fees. That result would be unconscionable.

Wells Fargo admitted in its November 19, 2021, letter to the Hummels that it had incorrectly assessed late fees to their account after processing a payment with the incorrect date Appx. 63-127. Wells Fargo then attempted its own, ineffective, half-measured effort to address its misconduct. But the Hummels have alleged claims for statutory damages against Wells Fargo, to provide the relief and compensation that they (and other similarly situated borrowers) are entitled to under the law.

The district court incorrectly described the Hummels' claims as being "over the same alleged conduct." Appx. 24. On that point, the district court was wrong. Nevertheless, the release would extinguish the improper fee claims of all members of the proposed settlement class—based on improper accounting that is factually distinct from the Sorace plaintiffs' claims—which are entirely repossession related. Appx. 366-69, §§ 10.1 - 10.6. Thus, any suggestion that the Hummels

could have protected their own interests by opting out of a settlement class would be facile and reductive.  Since the district court denied the Hummels' request to intervene, those claims would not be addressed in Sorace litigation and the Hummels (and members of the Sorace settlement class sharing those claims) would have their independent claims surrendered unfairly.

Consequently, the district court erred once more when it approved Wells Fargo's inequitable, gratuitous, sprawling release.  *Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 494 (3d Cir. 2017) ("the scope of the release is an important consideration in evaluating whether a settlement is fair and adequate under Rule 23(e).").

**III.   The District Court Erred in Permitting Wells Fargo to Issue Tax Forms Evidencing Forgiveness or Cancellation of Debts That Were to Have Been Fully Compromised under the Settlement.**

***Standard of Review.***  This Court reviews "a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) *quoting In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008).

Despite what the Sorace plaintiffs' counsel may now argue to protect his position in this case, he struck a distinctly different note during his representation of the would-be intervenors and objectors in *Brennan v. Community Bank, N.A.*, M.D.

Pa., case no. 3:13-cv-02939-MEM.  In that case, in the shoes of objectors' counsel, the Plaintiffs' attorney appears to have agreed with the Hummels' position concerning forms 1099-C.  As the Sorace plaintiffs' attorney, Richard Shenkan, Esq., argued then:

> Objectors believe that the <u>Bank should not be issuing 1099-C's in connection with the deficiency waivers, at all</u>….
> Sending blanket 1099-C's to class members serves to immunize the bank from liability while <u>burdening class members to defend against a tax which they don't owe</u>.

Attached as *Exhibit 2*, pp. 19-20 (emphasis added).[2]

The erstwhile argument of the Sorace plaintiffs' counsel—against issuance of forms 1099-C—has even greater strength here in this case since the "Agreement and the settlement it evidences are made in compromise of disputed claims."  Appx. 327.  In defining "Deficiency Balance" the settlement agreement acknowledged that "[t]he Parties agree[d] that the Deficiency Balances for all Settlement Class Members are **<u>disputed liabilities</u>** that are being **<u>fully compromised</u>** by way of an accord and satisfaction through this Settlement."  Appx. 331, § 1.18 (emphasis added).

Under the "contested liability doctrine," this Court has explained that, "if a taxpayer, in good faith, disputed the amount of a debt, a subsequent settlement of

---

[2] The Hummels respectfully request that this Court take judicial notice of that publicly filed document.

the dispute would be treated as the amount of debt cognizable for tax purposes." *Zarin v. Commissioner*, 916 F.2d 110, 115 (3d Cir. 1990). And *Zarin* is by no means an outlier. Its reasoning is consistent with decisions of other courts and revenue ruling guidance from the IRS. *Antista v. Fin. Recovery Servs*., No. 2:17-cv-3567 (WJM), 2017 U.S. Dist. LEXIS 213609, at *3 ("the tax code contains reporting exceptions for… debts disputed at the time of discharge…" ); (D.N.J. Dec. 28, 2017) *citing Zarin*, 916 F.2d at 115; *Rood v. Commissioner*, Docket No. 3366-94., 1996 Tax Ct. Memo LEXIS 262, at *9 (T.C. May 29, 1996) aff'd *Rood v. Comm'r of IRS*, 122 F.3d 1078 (11th Cir. 1997) ("…cancellation of all or part of a debt is made in settlement of a dispute concerning the debt, no income from cancellation of indebtedness arises."); 1984 IRB LEXIS 102, *6 (I.R.S. July 1, 1984) ("The amount owed by the taxpayer that is forgiven by the seller in return for a release of a contract counterclaim is not income from discharge of indebtedness under section 61 (a) (12) of the Code and therefore is not subject to exclusion under section 108.").

Nevertheless, Wells Fargo will issue IRS forms 1099-C for forgiven deficiency claims exceeding $600. Appx. 351. That improperly characterized cancellation of indebtedness would create "phantom income," increasing the tax burdens for the members of the settlement class. *See* 26 U.S.C. § 61(a)(11) ("gross income" defined to include "[i]ncome from discharge of indebtedness");

26 U.S.C. § 108(e)(1) ("general rule that gross income includes income from the discharge of indebtedness"); *Shull v. Synchrony Bank*, No. 1:19-cv-00715, 2020 U.S. Dist. LEXIS 52365, at *9 (M.D. Pa. Mar. 26, 2020) ("The 1099-C issuance negatively impacts debtors because they must generally report the debt discharge as income.").

The district court appears not to have recognized the distinction between the compromise of disputed debts under *Zarin*'s contested liability doctrine, and debt forgiveness—instead referring throughout its opinion to "forgiveness." *See* Appx. 15, 24-26, 29-31. Likewise, during the fairness hearing, the Sorace plaintiffs' counsel flat-out admitted that the issuance of forms 1099-C was likely to generate problems for class members:

> THE COURT: And as we know from other cases, this kind of forgiveness of a balance, if you will, has been part of settlements in areas like this. It's something courts have approved. Is anyone aware of any of those settlements resulting in any problems on the back end for members of the class with respect to tax consequences --
>
> MR. SHENKAN: Yeah.
>
> THE COURT: -- or any court opining on that.
>
> MR. SHENKAN: I get phone calls from class members, and they either make the payment and then ask for a refund, or they can't afford to make the payment on a tax. And I contested it in tax court. You know, generally I have never had any problems getting class members relief. But these are some things that on the backend do happen.

Appx. 889-90, *Transcr.* 28:18-29:6.

As for Wells Fargo's response to the district court's inquiry on the same issue, it was unilluminating. *Id.* at 893, 32:21-24 ("I mean, the simple response is I don't know the answer to that because Wells Fargo's taxes are remarkably complicated, as you might imagine. And I'm not Wells Fargo's tax lawyer."). Whether or not Wells Fargo's tax lawyer appeared at the fairness hearing, this Court's precedent on the contested liability doctrine is unambiguous. *Zarin v. Commissioner*, 916 F.2d 110, 115 (3d Cir. 1990).

While the harm to class members from the potential tax liability arising from the improper issuance of forms 1099 should have concerned the district court, the corresponding benefit to Wells Fargo also signaled an unfair outcome. The value of tax deductions to Wells Fargo from $64.39 million in losses would almost certainly exceed the $15 million that the bank agreed to pay under the settlement agreement. But that inequitable outcome would be incorrect as a matter of law. That is because the compromise of the deficiency claims is neither a loss to Wells Fargo nor gross income to the plaintiffs. Wells Fargo unequivocally agreed to "to fully compromise the Deficiency Balance alleged to be owed by each Settlement Class Member whose Account has a Deficiency Balance." Appx. 334, § 3.2; *see also,* Appx. 393 ("The parties have a good faith dispute as to the validity of this debt…"). Consequently, no reason exists to issue

any forms 1099-C. Under those circumstances, the controlling precedent of this Court instructs that "there is no tax consequence" from the compromise of a disputed claim. *Zarin v. Commissioner*, 916 F.2d 110, 115 (3d Cir. 1990).

The tax features of the settlement are inequitable, contrary to law, and prevent the class settlement from meeting the requirements of fairness, reasonableness, and adequacy under Rule 23(e)(2). For that additional reason, this Court must reverse the decision of the district court.

## IV. The District Court Erred in Awarding the Sorace Plaintiffs' Counsel Excessive Attorneys' Fees.

*Standard of Review.* "The standards employed calculating attorneys' fees awards are legal questions subject to plenary review." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir. 2005). However, attorneys' fee awards are reviewed for abuse of discretion, "which can occur if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *Rite Aid*, 396 F.3d at 299 *quoting Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.)*, 243 F.3d 722, 727 (3d Cir. 2001).

In a case that is virtually indistinguishable on its facts, a court denied the Sorace plaintiffs' attorney's request for 40% of a common fund after the settlement of a vehicle repossession class action. *Kelly v. Santander Consumer, USA*, E.D. Pa.,

case no. 2:20-cv-03698-MMB, doc. no. 114.[3]  Following its analysis of the *Wawa*

decision, the *Kelly* court declined to grant the Sorace plaintiffs' counsel the $5.6

million it had requested (*i.e.*, 40% of the common fund) and, in a decision attached

hereto as *Exhibit 1*, it decided that:

> [T]his Court must be cognizant that **every dollar that goes
> to Class Counsel is a dollar less to class members**. In
> assessing attorney fees, **the district court "must protect
> the class's interest by acting as a fiduciary for the class**."
> *In re Rite Aid*, 396 F.3d at 307; *see also Report of the Third
> Circuit Task Force, Court Awarded Attorneys Fees*, 108
> F.R.D. 237, 251 (1985) (The court "must monitor the
> disbursement of the fund and act as a fiduciary for those
> who are supposed to benefit from it, since typically no one
> else is available to perform that function.")….
>
> In consideration of the above-listed factors, **this Court
> awards Class Counsel attorney fees in the amount of
> $ 4.2 million, representing 30%** of the $14 million cash
> settlement and more than double the lodestar, which is
> reasonable in this Court's view.

*Exh. A*, pp. 11-12.  Thus, in *Kelly*, the court's decision to award the Sorace plaintiffs'

attorney a reduced fee (from 40% to 30% of the common fund) resulted in an

additional $1.4 million becoming available to the class.  The district court should

have conducted a similar analysis in this case.

That decision appears to have been well-justified, given that a "robust and

thorough judicial review of fee applications is required in all class action settlements."

---

[3] The Hummels respectfully request that this Court take judicial notice of that
  decision.

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 (3d Cir. 2011) (internal quotations omitted).  In cases involving a common fund, the percentage of recovery method is typically preferred over a lodestar analysis.  *Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 333 (3d Cir. 1998). "The court awarding [attorneys' fees] should articulate reasons for the selection of the given percentage sufficient to enable a reviewing court to determine whether the percentage selected is reasonable." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 196 (3d Cir. 2000) *citing* Moore's Federal Practice, Manual for Complex Litigation (Third) § 24.121, at 206 (1997).

The historical rationale for awarding fees to be paid from a common fund has been that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  But courts must exercise discretion to determine a "reasonable percentage" for an award from a common fund, "[b]y scrutinizing the size of the fund or the amount of benefit produced for the class to calculate an award based on a reasonable percentage of the amount the class recovered." *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, *11 (3d Cir. 2023).  That did not happen here.

In this case, the district court incorrectly added $65 million to a common fund of only $15 million.  Appx. 14.  According to the district court, Wells Fargo,

"through accord and satisfaction, agreed to forgive class members' disputed loan debts—an estimated $65 value." Appx. 18-19. But, as explored in this brief, *infra*, a <u>compromise</u> of a disputed debt does not give rise to imputed income in the same way that a <u>forgiven</u>, but otherwise legally valid, debt would." *See Zarin v. Commissioner*, 916 F.2d 110, 115 (3d Cir. 1990). For that reason, Wells Fargo should not be permitted to issue forms 1099-C, when it has expressly "agree[d] that the deficiency balances for all settlement class members are <u>disputed liabilities</u> that are being <u>fully compromised</u> by way an of accord and satisfaction through this settlement." Appx. 331, ¶ 1.18 (emphasis added, capitalization normalized).

The Hummels counsel agreed at the fairness hearing that "the <u>accord and satisfaction</u> element is terrific…. But not if they're foisted with a tax burden while Wells Fargo benefits at the same time." Appx. 950, *Transcr.*, 89:2-9. The district court misquoted that colloquy, writing "[t]he Hummels describe the <u>debt forgiveness</u> as 'terrific.'" Appx. 24. Once again, debt forgiveness gives rise to income from cancellation of indebtedness—the compromise of a disputed debt does not.

By way of illustration, a check for $97 and an agreement to fully compromise a disputed deficiency claim of $10,000 would be meaningful relief. In contrast, a check for $97 and an agreement to forgive a deficiency claim of $10,000 would not—the $97 would almost certainly be insufficient to cover the incremental tax burden.

Moreover, the details of this case demonstrate that mere forgiveness of the deficiency balances would provide class members with little incremental relief beyond what they would already receive from the deletion of their credit trade lines. Consider that Wells Fargo has collected $6.87 million in deficiency balance claims from class members, but it is prepared to forgive $65 million in uncollected deficiency balances.  Appx. 5, 11.  Wells Fargo's success rate in collecting its disputed deficiency balance claims is evidently below 10%.

"Reasonableness has always been the measurement for fees in a common fund…" and "that reasonableness is tied to the benefit rendered to the class."  *In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 720 (3d Cir. 2023); *ALI Principles Law Agg. Lit.* § 3.13, cmt. a (2010) ("For cash judgments or settlements, the actual value is the value actually paid to class members…. For judgments or settlements involving equitable relief, the value is the actual value of the relief to the class.").

The twin concerns that "must play central roles in the assessment of a fee award" are a comparison of the proposed compensation against "the benefit given to the class, using either the amounts paid or the sums promised" and the existence of any "side agreements between class counsel and the defendant [that] suggest an unreasonable attorney's fee award."  *Wawa,* 85 F.4th 712 at *7.  In this case, the common fund is nothing more than the $15 million in cash that Wells Fargo has agreed to pay to fund the settlement.

Moreover, there are other significant reasons to award considerably less than the requested attorneys' fees. The district court was satisfied that the mediator reported "that the amount of attorneys' fees 'was never used as a bargaining chip' in negotiations." Appx. 27. First, it is not the role of a mediator "to voice the interests of a group for which no one else is speaking." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F. 3d 223, 235 (2d Cir. 2016). Rather, "district judges presiding over [class] actions are expected to give careful scrutiny to the terms of proposed settlement in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (quotations omitted).

Second, in this case, the attorneys' fees were unquestionably a product of negotiation, and they need not have been used as a bargaining chip. During their settlement discussions, the parties had certain known that Wells Fargo had collected approximately $6.87 million in deficiency claims from class members. As the parties agreed to refund those payments and make a pro rata distribution to class members, they weren't picking numbers out of thin air. Plaintiffs' counsel had to have known that the bulk of the remaining common fund would be allocated between distribution to the class and attorneys' fees. Simple arithmetic reveals that the result of that negotiated allocation was $2 million for the distribution and $6 million for attorneys' fees.

Third, the district court's conclusory statement that "the case's complexity and duration supports approval of the award" is not at all clear from the case record. The plaintiffs' counsel amended the complaint after Wells Fargo removed the case to federal court, and then again after the defendant moved to dismiss the amended complaint.  Appx. 30.  The Sorace plaintiffs responded to a motion to dismiss the second amended complaint—but the district court never adjudicated that motion.  *Id.* Moreover, the record is devoid of evidence of any actual exchange of discovery, and the parties have provided no detail regarding the plaintiffs' attorneys' "due diligence regarding the claims and benefits of this settlement" nor of the "further critical information regarding the class" that he received during mediation.  Appx. 298.

Fourth, while the plaintiffs' counsel claimed that he would file detailed timekeeping records to evidence his services, he instead provided only non-contemporaneous, reconstructed descriptions, which—without any explanation—he provided only to the district court for *in camera* review.

Finally, the Sorace plaintiffs' attorney knows that he is overreaching with his fee request.  In a mirror image of this case where he represented a settlement class against another bank and sought to recover 40% from a common fund of $14 million but the *Kelley* court limited that very same lawyer to a still-generous award 30% of the common fund.  *Exh. 2.*

The Sorace plaintiffs' attorney should not be awarded $6 million, amounting to 40% of the common fund, and the district court erred in ruling otherwise.

## V.   The District Court Erred in Approving an Insufficiently Funded Settlement.

***Standard of Review.***  Decisions approving settlement terms in class action cases are "left to the sound discretion of the district court." *Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 299 (3d Cir. 1998) *quoting Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).  However, the Court "exercises plenary review over the lower court's application of legal standards in making that determination." *United States ex rel. Bogart v. King Pharm.*, 493 F.3d 323, 328 (3d Cir. 2007); *Drazin v. Horizon Blue Cross Blue Shield of N.J., Inc.*, 528 F. App'x 211, 213 n.4 (3d Cir. 2013).

Rule 23(e)(2) guides district courts' analysis of settlement agreements in the class action context.  The Rule provides:

> *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> **(A)** the class representatives and class counsel have adequately represented the class;
>
> **(B)** the proposal was negotiated at arm's length;
>
> **(C)** the relief provided for the class is adequate, taking into account:
>
> > **(i)** the costs, risks, and delay of trial and appeal;

**(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

**(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and

**(iv)** any agreement required to be identified under Rule 23(e)(3); and

**(D)** the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. . . . The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate."  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) *quoting Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864 (1975).

This Court reviews district courts' decisions approving the terms of a class action settlement for abuse of discretion.  *Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 299 (3d Cir. 1998).  "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."  *Int'l Union, United Auto., etc. v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987) *cert. denied*, *Int'l Union, etc. v. Mack Trucks, Inc.*, 499 U.S. 921 (1991).

The district court addressed the Hummels' objection that the settlement fund was insufficient in a single, half-page paragraph. Appx. 26. Even then, the district court focused on the Hummels' estimation of the expense of administering the settlement, incorrectly writing that the Hummels claimed the expense would be $2.5 million. *Id.* In fact, their actual estimate for administrative costs was only "$1,670,500 (*i.e.*, $100 per account)" [Appx. 580]—and the Hummels were left to guess because the parties had been silent on the issue. Appx. 578; 560. Other than the inaccurate estimation, the district court's only further analysis of the objection was that it "takes a myopic view of the Settlement Agreement's benefits and fails to account for value conferred by debt forgiveness and deletion of credit tradelines." Appx. 26.

**(a) Analysis of the Deficiency Balance Compromise.**

The Sorace plaintiffs claimed to have reached an "exceptional settlement" that would "confer benefits of more than $80 Million to more than 21,000 Pennsylvania consumers." *Appx.* 473. That statement should be true, but it isn't. Instead, as matters stand, Wells Fargo and the Sorace plaintiffs' lawyer anticipate receiving extraordinary benefits at the expense of the unnamed plaintiffs—the vast majority of whom are unlikely to receive any net benefit.

But that need not have been the case. After all, the parties acknowledged that a good faith dispute existed over the validity of Wells Fargo's claims for deficiency

balances against class members allegedly remaining after the bank repossessed and sold their vehicles—and Wells Fargo agreed to resolve the dispute by compromising the value of all deficiency balance claims to zero. Appx. 334-35. Further, since the disputed deficiency claims would be fully compromised, Wells Fargo also agreed to refund all class members' payments. Appx. 346-47. But then the settlement terms took a sharp turn in an unfavorable direction.

Under the settlement agreement, class members who receive a deficiency balance compromise of more than $600 will receive tax forms 1099-C (for cancellation of indebtedness). Appx. 397, ¶ 14. As addressed more fully in this brief, *infra*, a compromise of a disputed debt does not give rise to imputed income in the same way that a forgiven, but otherwise legally valid, debt would. But, because Wells Fargo will issue forms 1099-C, the promise of relief from the fully compromised deficiency claims is really a Trojan horse, concealing tax burdens for class members and tax benefits for Wells Fargo. Appx. 624, ¶14. And, while class members could decline the credit trade line deletion benefit, they would have had to opt out entirely to avoid the deficiency compromise tax trap. Appx. 368-70. Wells Fargo's insistence upon issuing forms 1099-C means that it will claim or retain tax benefits from *forgiving* (not compromising) more than $65 million of deficiency balance claims, and—in direct proportion—affected class members may be saddled with imputed income tax liability. Appx. 30.

Under that framework, the district court erred by determining that the "$65 million in debt relief" contributed to "a settlement with a monetary value above $80 million." Appx. 11. While the deficiency balance compromise *should* have produced a major benefit to the class, it is instead being employed a bookkeeping tax strategy for Wells Fargo's benefit.

**(b) The Common Fund.**

As for the cash that Wells Fargo will actually contribute, the agreement is crystal clear that, "[u]nder no circumstances shall Wells Fargo's total payment obligation under the Settlement Agreement exceed $15,000,000." Appx. 348, ¶ 3.3.6; 375, ¶15.2 (same). Under the facts presented here, the clear majority of that $15 million would be dissipated substantially long before any pro rata distribution could be paid to class members.

Refunding approximately $6.87 million of payments on the fully compromised deficiency balances will reduce the fund balance to about $8.13 million. Appx. 5. Counsel fees ($6 million) and expenses ($24,689.33) approved by the district court would leave only $2.1 million for the expenses of settlement administration, plaintiffs' incentive awards, and—*finally*—a pro rata distribution to the class. Appx. 31; 33.

According to the parties, class members should expect a distribution payment of about $97 (or half that amount for class members with shared accounts). Appx.

26.  But a distribution of $97 is not realistically comparable to the damages that would be awarded to a successful class member.  According to the Sorace plaintiffs' class notice, members who opt out and separately prevail upon their claims would be entitled to "minimum statutory damages… computed by adding the credit service charge (finance charge) plus 10% of the principal amount of [their] loan[s]."  Appx. 619.  By way of illustration, the Hummels would have been entitled to minimum statutory damages of $20,068.31, since they financed $28,615.48, subject to a credit service charge of $17,206.76.  Appx. 604. Not to belabor the obvious, but $97 and $20,068.31 are two orders of magnitude apart.

However, in addressing the eighth *Girsh* factor, the district court found that "the range of reasonableness of the settlement fund in light of the best possible recovery" analysis could be conducted even if it isn't possible to precisely determine what the best possible recovery would have been.  Appx. 19 *citing In re N.J. Tax Sales Certificates Antitrust Litig*, Civil Action No. 12-1893 (MAS) (TJB), 2016 U.S. Dist. LEXIS 137153, at *36 (D.N.J. Sep. 30, 2016); *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).  However, in *N.J. Sales Tax*, the court *did* conduct the analysis, working from the objector's recovery projections and weighing it against the circumstances of the case.  *Id.* at 37.  Here, in contrast, the district court simply concluded that the settlement is reasonable.  Appx. 19-20.

Admittedly, the *Girsh* factors are not dispositive.  They are simply items "that courts should consider when deciding whether to approve a settlement." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013).  Here, however, the analysis of the district court suggests that it did not seriously consider the Hummels' objection that the value of the settlement is insufficient.

That conclusion that the settlement was not fair, reasonable, or adequate becomes undeniable after consideration of the remaining issues presented in this appeal.

## VI.    The District Court Erred by Permitting the Sorace Plaintiffs' Counsel to Withdraw the Timely, Written Objection of a *Pro Se* Class Member.

***Standard of Review.***  When reviewing decisions of a district court incident to its approval of a class action settlement, the role "an appellate court is to ascertain whether or not the trial judge clearly abused his or her discretion in approving or rejecting a settlement agreement." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 295 (3d Cir. 2011).

On December 28, 2023, a *pro se* member of the Sorace settlement class, Celeste Brooks-Wade, filed an objection in the form of a letter (the "Brooks-Wade Objection"). The Brooks-Wade Objection listed specific grievances with the Order Preliminarily Approving Settlement.  On December 29, 2023, counsel for the representative plaintiffs, Richard Shenkan, filed a Notice of Withdrawal of the

Brooks-Wage Objection on her behalf, which appears to be drafted entirely by Mr. Shenkan and filed under his signature.

The Sorace plaintiffs' attorney has refused to explain his contact with Ms. Brooks-Wade. During a phone call with the Hummels' counsel, Attorney Shenkan agreed with Ms. Brooks-Wade concerning her objection, however Attorney Shenkan refused to reveal whether he unilaterally reached out to her.

Because of that sequence of events, there is little evidence in the record concerning Attorney Shenkan's dealings with Ms. Brooks-Wade. Notably, Rule 23 requires court approval for any payment in connection with the withdrawal of an objection:

> **(B)** *Court Approval Required for Payment in Connection with an Objection.* Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:
>
> **(i)** forgoing or withdrawing an objection, or
>
> **(ii)** forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

Fed. R. Civ. P 23(e)(5)(B). We cannot know whether Attorney Shenkan offered any compensation in exchange for withdrawing her objection; nor whether he may have made other representations to her that are not on the record. But, even if Attorney Shenkan did nothing more than promise the financial benefits that would be permitted to eligible class members—because that promise was incident to the

withdrawal of the Brooks-Wade Objection, court approval had been required under the plain language of Rule 23.

Thus, on that additional basis, this court should reverse the decision of the district court.

## **Conclusion**

For all the foregoing reasons, this Court should reverse the decision of the District Court and remand the case with appropriate instructions for further proceedings.

Dated:  June 3, 2024                              Respectfully submitted:


   /s/ Aurelius Robleto
Aurelius Robleto
PA ID No. 94633
Renee M. Kuruce
PA ID No. 314691
ROBLETO KURUCE, PLLC
6101 Penn Ave., Ste. 201
Pittsburgh, PA 15206
Tel:  (412) 925-8194
Fax:  (412) 346-1035
apr@robletolaw.com
rmk@robletolaw.com

## COMBINED CERTIFICATIONS

I, Aurelius Robleto, hereby certify under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

A.    **Bar Membership.**  I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

B.    **Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements.**  This document complies with the word limit of Fed. R. App. P. Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 9,823 words.

C.    **Service.**  I certify that on June 3, 2024, I served a true and correct copy of the foregoing brief upon all counsel of record via electronic notification/email.

D.    **Identical Compliance of Briefs.**  The text of the electronically filed brief and the text of the copies are identical.

E.    **Virus Check.**  A virus check has been performed on the PDF file containing the brief.  The virus check was completed using Bitdefender Virus Scanner, ver. 3.15 (3.15.269).

Dated: June 3, 2024

/s/ Aurelius Robleto
Aurelius Robleto
PA ID No. 94633
ROBLETO KURUCE, PLLC
6101 Penn Ave., Ste. 201
Pittsburgh, PA 15206
Tel:  (412) 925-8194
Fax:  (412) 346-1035
apr@robletolaw.com

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HUGH KELLY and CHRISTINE KELLY, individually and on behalf of all others similarly situated,**<br><div align="right">Plaintiffs,</div><br>**v.**<br><br>**SANTANDER CONSUMER USA, INC.,**<div align="right">Defendant.</div> | **CIVIL ACTION**<br><br>**NO. 20-3698** |

## MEMORANDUM

**Baylson, J.**                                             **December 15, 2023**

Pending before this Court is a Motion for Final Approval of Settlement Agreement, Certification of Settlement Class, Approval of Attorney Fees and Costs, Entry of Final Judgment, and Dismissal with Prejudice (ECF No. 102) along with a Petition for Attorneys' Fees, Reimbursement of Expenses and Service Awards (ECF No. 110).

This case is a class action that was brought under the Pennsylvania Uniform Commercial Code, 13 Pa.C.S. §§ 9601, et. seq. (the "UCC") and the Motor Vehicle Sales Finance Act, 12 Pa.C.S. § 6251 et. seq. (the "MVSFA").[1] Counsel for both parties recently agreed to settle after extensive discovery and other pretrial matters. The overall settlement is in two categories. First, a cash payment of $14 million to the class and, secondly, the cancellation of outstanding debts allegedly owed by members of the class, the consumers who took loans from the Defendant but had failed to repay the principal and/or interest on those loans.

---

[1] This Court has jurisdiction over this civil action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, 1711-1715 because minimum diversity exists, the amount in controversy exceeds $5 million, and the number of members of the proposed class is at least 100 class members.

As examined in closer detail below, the Plaintiffs have demonstrated that the overall settlement is fair and reasonable, and that approval of the overall settlement is warranted. This Court is also satisfied from the affidavit by an experienced mediator that the parties retained, Professor Eric D. Green, who has filed a detailed Declaration that he conducted the settlement negotiations and that the counsel were vigorously representing their respective clients, and that the settlement resulted from hard bargaining without any evidence of collusion. This Court has no reason to doubt the accuracy of this mediator's report.

As to the Petition for Attorneys' Fees, counsel filed an initial petition (ECF No. 102), without any lodestar information, and requested a counsel fee of 40% of the settlement amount. Without ruling on that request, this Court promptly advised counsel that under Third Circuit jurisprudence, the Plaintiffs' counsel must support their request for attorneys' fees in a class action settlement with lodestar information, which was eventually supplied by Plaintiffs on November 1, 2023 (ECF No. 110). The following day, the Third Circuit decided an important decision on class action settlements, In re Wawa, Inc. Data Security Litig., 85 F.4th 712 (3d Cir. 2023) ("Wawa"), as of November 2, 2023.

Because of Wawa's significance, this Court asked counsel to file a brief as to its relevance, if any, on the request for attorneys' fees in this case. Counsel's response (ECF No. 117) satisfies this Court that most concerns which the Third Circuit expressed in its Wawa decision are not present in this case.

In considering the lodestar information, which was eventually submitted as noted above, and supplemented by additional information to support the hourly rates requested for the attorneys who worked on this case, filed December 11, 2023 (ECF No. 121), this Court is able to

construct a lodestar calculation, and consider that in connection with an appropriate award by applying a reasonable percentage of the cash settlement.

With respect to assessing attorney fees, this Court has determined not to add any value to the settlement amount for the forgiveness of the outstanding debts of members of the class because experience shows that it is highly unlikely that the Defendant, a larger national bank, would go to the trouble or expense of suing the thousands of individual consumers for accumulated debts. Even if litigation against debtors was successful, actual collection of these small amounts is also unlikely, and they would probably be "written off" in the normal course of business.

As explained in <u>Wawa</u>, this Court must use an overall standard of "reasonableness" under longstanding Third Circuit precedent in determining the award of attorneys' fees in a case of this nature.  <u>See</u> <u>Wawa</u>, 85 F.4th at 720 ("Reasonableness has always been the measurement for fees in a common fund.").  This Court notes that Plaintiffs' counsel has represented the plaintiffs and class with skill and that the case proceeded with a minimum amount of pretrial motion practice, allowing this Court to infer that discovery was conducted appropriately,  without undue conflict or unnecessary motions.

There is no evidence in the case that Plaintiffs' counsel added unnecessary hours to the amount of time spent on this case.  This Court also takes note that after this case had started, the former Chief Judge of this Court, Hon. Lawrence Stengel, became co-counsel with Plaintiffs, and has signed the petition for class approval and award of attorneys' fees, which warrants considerable weight in making the following award.

# I.    ANALYSIS OF CLASS ACTION SETTLEMENT

Under Federal Rule of Civil Procedure 23(e), "The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."  A class action cannot be settled until the court has determined that the proposed settlement is "fair, reasonable, and adequate."  In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 282, 316 (3d Cir. 1998).  The Third Circuit applies a nine-prong test—the Girsh factors—to determine whether a proposed class action settlement is reasonable:

(1) the complexity, expense and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6)  the risk of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and,
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal citations omitted).  The Third Circuit has also suggested additional factors to consider, known as the Prudential considerations, which include:[2]

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for

---

[2] "Unlike the Girsh factors, each of which the district court must consider before approving a class settlement, the Prudential considerations are just that, prudential.  They are permissive and non-exhaustive, illustrat[ing]…[the] additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms."  In re Baby Products Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013).

attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

In re Prudential, 148 F.3d at 323.

District courts "must make findings as to each of the Girsh factors, and the Prudential factors where appropriate," and "cannot substitute the parties' assurance or conclusory statements for [their] independent analysis of the settlement terms." In re Pet Food, 629 F.3d 333, 350-51 (3d Cir. 2010). In Baby Products, the Third Circuit presented an additional inquiry for a thorough analysis of settlement terms: "the degree of direct benefit provided to the class." Baby Products, 708 F.3d at 174.

For the reasons provided below, this Court finds that the Girsh factors and the relevant Prudential and Baby Products considerations weigh in favor of settlement approval.

### a. The Complexity, Expense, and Likely Duration of the Litigation

This case involves complex issues of statutory interpretation and other issues. Settlement avoids the need for the continued expenses of discovery and the risks associated with dispositive motions, trial, and potential appeal. This factor strongly supports settlement.

### b. The Reaction of the Class to the Settlement

The Opt-Out Deadline and Objection Deadline was September 22, 2023. Class Members were given 60 days from the Short Form Class Notice mailing date to object or opt out, which is sufficient opportunity. No class members have filed objections, and only four class members have opted out. This factor strongly supports settlement.

### c. The Stage of the Proceedings and the Amount of Discovery Completed

With respect to this factor, the Third Circuit explained in Prudential:

5

The parties must have an adequate appreciation of the merits of the case before negotiating. To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken.

In re Prudential, 148 F.3d at 319 (internal quotations omitted).  This case was litigated for over one year before Plaintiffs and Defendant opened settlement discussions with the help of an experienced mediator on a class-wide basis.  With respect to discovery, Plaintiffs served written discovery in May 2021.  In total, more than 6,500 pages were produced over the course of discovery. Plaintiffs also engaged in third-party discovery and deposed Defendant's Senior Director of Collections and Recovery Operations on September 14, 2021. The parties filed their Joint Motion to Stay the case to discuss settlement approximately two weeks after the deposition. This factor also weighs in favor of approving the settlement agreement.

### d.  The Risks of Establishing Liability and Damages

These two Girsh factors are closely related and will be addressed together.  As Plaintiffs note, Defendant vigorously disputes Plaintiffs' claims, and there is no guarantee that Plaintiffs will be able to establish liability.  Further, Plaintiffs will face challenges in establishing damages since they seek equitable remedies, including the requests for deletion of credit tradelines, which have not been subject to appellate review in Pennsylvania or the Third Circuit. The settlement provides for these remedies. These two factors weigh in favor of approving the settlement.

### e.  The Risks of Maintaining the Class Action Through Trial

The Third Circuit has noted that "[in] a settlement class, this factor becomes essentially 'toothless' because a district court need not inquire whether the case, if tried, would present intractable management problems…for the proposal is that there should be no trial."  In re NFL Players Concussion Injury Litig., 821 F.3d 410, 440 (3d Cir. 2016) (internal quotations omitted).

Since the settlement avoids the risk of maintaining a certified class throughout trial, this factor weighs in favor of settlement.

**f. The Ability of the Defendants to Withstand a Great Judgment**

This factor is neutral. Other courts within the Third Circuit "regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts." In re Flonase Antitrust Litig., 291 F.R.D. 93, 104 (E.D.Pa. 2013) (internal citations omitted). This factor neither weighs in favor nor against settlement.

**g. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

The eighth and ninth Girsh factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." In re NFL, 821 F.3d at 440. The proposed settlement here—including $14 cash settlement payment and the full compromise of $269,204,457.05 in deficiency balances—is reasonable in light of the circumstances of the litigation and the risks of proceeding to trial. This factor weighs in favor of approving the settlement.

**h. Prudential Factors**

The relevant Prudential factors largely weigh in favor of approving the settlement. The Court agrees with Plaintiffs that the pleadings, settlement negotiations, and class certification motion have developed the underlying substantive issues such that the parties may assess the merits of the claims and defenses. Members of the Class have had a sufficient opportunity to opt out of the settlement. The procedures for processing the claims under the settlement are fair and reasonable. Attorneys' fees are discussed in Section II below.

### i. **Baby Products Inquiry**

There is a strong degree of direct benefit to the class in the form of cash payment, fully compromised deficiency balances, and requested deletion of credit tradelines.  This factor also weighs in favor of approving the settlement.

Overall, the <u>Girsh</u> factors and <u>Prudential</u> and <u>Baby Products</u> considerations weigh strongly in favor of class settlement approval.  For these reasons, this Court finds the settlement to be fair, reasonable, and adequate.  This Court next considers the attorney fee award.

## II.     **ANALYSIS OF ATTORNEY AWARD**

A district court should consider ten factors when analyzing a fee award in the class action settlement context:

(1) The size of the fund created and the number of persons benefitted;
(2) The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
(3) The skill and efficiency of the attorneys involved;
(4) The complexity and duration of the litigation;
(5) The risk of nonpayment;
(6) The amount of time devoted to the case by plaintiffs' counsel;
(7) The awards in similar cases.
(8) The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;
(9) The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained;
(10)      Any "innovative" terms of the settlement.

<u>In re AT&T Corp.</u>, 455 F.3d 160, 166 (3d Cir. 2006) ("In reviewing an attorneys' fees award in a class action settlement, a district court should consider the <u>Gunter</u> factors [factors 1-7 above]"[3] and "the <u>Prudential</u> factors [factors 7-10 above]").  A district court should also consider "any other factors that are useful and relevant with respect to the particular facts of the case."  <u>Id.</u>

---

[3] <u>Gunter v. Ridgewood Energy Corp.</u>, 223 F.3d 190 (3d Cir. 2000).

These factors "need not be applied in a formulaic way…and in certain cases, one factor may outweigh the rest."  Id.

This Court notes that each of the Gunter and Prudential factors above generally support a substantial attorneys' fee award in this case.  As explained by Plaintiffs in their Petition for Attorneys' Fees, Reimbursement of Expenses, and Service Awards (ECF No. 110):

(1) The settlement principally provides a $14 million cash payment and includes a compromise of $269,204,457.05 in deficiency balances for a class consisting of 48,108 Settlement Class Members;

(2) The Long Form Class Notice stated that Class Counsel would apply for an attorney award fee, and there have been no objections to the settlement;

(3) As Class Counsel notes, the "single clearest factor reflecting the quality of Class Counsels' services to the Class are the results obtained."  ECF No. 110-1 at 15 (citing In re Flonase Antitrust Litig., 291 F.R.D. 93, 104 (E.D.Pa. 2013)).  The skill and efficiency of Class Counsel has been amply demonstrated through the settlement agreement reached here;

(4) This was a complex litigation, and included, as Class Counsel notes, difficult issues of statutory interpretation pertaining to the interaction of the Pennsylvania UCC and the MVSFA, as well as issues involving the compromise of the Deficiency Balances;

(5) Since Class Counsel undertook this action on a contingent fee basis, there was a substantial risk of nonpayment.  Class Counsel represents that they have expended over a thousand hours and over $30,000 in costs without any compensation thus far;

(6) [See below]

(7) Awards in other class actions are generally within the same range[4];

(8) [Not applicable to this action]

(9) Plaintiffs represents that the "fee agreement between counsel and each of the Representative Plaintiffs provides for a fee equal to 40% of the total benefit conferred upon the class."[5]

---

[4] See Gaskill v. Gordon, 160 F.3d 361 (7th Cir. 1998) (awarding attorney fees of 38% of the common fund); Taubenfeld v. Aon Corp., 415 F.3d 597 (7th Cir. 2005) (approving attorney fees of 30% of 7.25 million settlement).

[5] ECF No. 110-1 at 27, Declaration of Richard Shenkan at 19.

(10)     The settlement does not involve particularly innovative terms.  This factor is neutral, weighing neither in favor nor against the requested attorney fees.

The above factors weigh in favor of granting the attorney fee request.  However, this Court's analysis does not end with the <u>Gunter</u> and <u>Prudential</u> factors.  Where courts apply the percentage-of-recovery approach, the Third Circuit has held that it is "sensible" for district courts to also "cross-check" the percentage fee award against the lodestar calculation method.  <u>In re Rite Aid</u>, 396 F.3d at 305 (citing <u>Prudential</u>, 148 F.3d at 333).  The lodestar calculation involves "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys."  <u>Id.</u>  The multiplier—representing an "increase or decrease in the lodestar amount" —is a device that "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."  <u>Id.</u> at 306.  "In performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter" and "may rely on summaries submitted by the attorneys and need not review actual billing records."  <u>Id.</u> at 306-07.

This Court finds no issue with the lodestar calculations offered by Plaintiffs, who applied the billing rates provided by the Community Legal Services (CLS) of Philadelphia attorney fee schedule to calculate the lodestar for each of the attorneys who worked on the case. Plaintiffs then used a blended rate method, which has been approved by the Third Circuit, to determine the total lodestar of $1,908,393.  This Court finds this lodestar calculation method both reasonable and consistent with Third Circuit precedent.

This Court's lodestar cross check table is provided below:

| Attorney | Role | # of Hours | Hourly Rate Requested | Lodestar |
|---|---|---|---|---|
| Richard Shenken | Attorney (Shenkan Injury Lawyers) | 923.3 | $800 | $738,640 |
| Honorable Lawrence F. Stengel (Ret.) | Attorney (Saxton & Stump) | 14.6 | $800 | $11,680 |
| Jenna Townsend | Attorney (Shenkan Injury Lawyers) | 389.7 | $495 | $192,901.50 |
| Christopher Hogg | Attorney (Shenkan Injury Lawyers) | 1,355.8 | $565 | $766,027.00 |
| Lauri Smith | Para-professional | 205 | $240 | $49,200 |
| Andrea Gadd | Para-professional (Saxton & Stump) | 12.8 | $220 | $2,816 |
| Luke Pietrek | Para-professional | 315.3 | $240 | $75,672 |

**Total lodestar to date:** $1,908,393[6]

Plaintiffs request an attorney fee in the amount of $5.6 million, seeking a multiplier of three (3) times the total lodestar crosscheck, which equates 40% of the $14 cash settlement, "for the risk of loss and the excellent results effectuated." See ECF No. 110-1 at 48, Declaration of Richard Shenkan at 3. This Court agrees with Plaintiffs that the risk of loss and results effectuated from this case warrant additional compensation beyond the lodestar crosscheck. However, this Court must be cognizant that every dollar that goes to Class Counsel is a dollar

---

[6] This lodestar figure was determined by adding the blended rate for attorneys, which is $665.00 per hour, resulting in an aggregate attorney lodestar of $1,784,461.00 and the blended rate for paraprofessional/paralegal staff of $233 per hour, resulting in an aggregate lodestar of $123,932.00. See ECF No. 110-1 at 48, Declaration of Richard Shenkan at 3. The Third Circuit has suggested using a blended rate for lodestar cross-check, which entails a "much less detailed breakdown" than would otherwise be require for a full lodestar analysis. In re Rite Aid Corp., 396 F.3d at 306-307, n.16.

less to class members.  In assessing attorney fees, the district court "must protect the class's interest by acting as a fiduciary for the class."  In re Rite Aid, 396 F.3d at 307; see also Report of the Third Circuit Task Force, Court Awarded Attorneys Fees, 108 F.R.D. 237, 251 (1985) (The court "must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function.").

The amount of a fee award is "within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." Pub. Interest Research Grp. of N.J., Inc. v. Windall, 51F.3d 1179, 1184 (3d Cir. 1995) (internal quotations omitted).  In consideration of the above-listed factors, this Court awards Class Counsel attorney fees in the amount of $ 4.2 million, representing 30% of the $14 million cash settlement and more than double the lodestar, which is reasonable in this Court's view.  See, e.g., In re Veritas Software Corp. Securities Litig., 396 Fed. Appx. 815, 817-18 (3d Cir. 2010) (NPO) (approving fee award equal to 30% of $21.5 million settlement where lodestar multiplier was 1.52)[7]; Taubenfeld v. Aon Corp., 415 F.3d 597 (7th Cir. 2005) (approving fee award equal to 30% of $7.25 million settlement).

III.   **COSTS**

Class counsel requests reimbursement of $33,076.55 for expenses, which includes mediation costs, court costs, discovery-related costs, travel expenses, and payments to Class-Settlement.com for a Spanish translation of the Notice to class members.  This Court finds that

---

[7] The Third Circuit in In re Veritas noted, "[w]hile the 30% fee is admittedly large, the District Court took into account that class counsel spent four years, and thousands of hours of attorneys' labor, litigating this case.  The final lodestar multiplier of 1.52 was well within the range of attorneys' fees awarded and approved by this Court."  Id.; see also In re Prudential, 148 F.3d at 341 ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.").

these expenses are reasonable and will award counsel a reimbursement of these expenses from the settlement fund.

IV.     **INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

Plaintiffs request that this Court award each of the two representative Plaintiffs incentive awards in the amount of $15,000.  While an incentive award is warranted in this case, this Court finds that the requested reward is too high.  This Court will award $10,000 to each of the Class Representatives.

V.     **CONCLUSION**

For the foregoing reasons, this Court will approve the class action settlement and will award Class Counsel $4.2 million in attorney fees, $33,076.55 for expenses and $10,000 for each of the Class Representatives.  An appropriate order follows.

O:\CIVIL 20\20-3698 Kelly v Santander\20cv3698 memorandum re final approval.docx

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROL A. BRENNAN, ANTHONY COLINO, and COURTNEY BELLOMO, individually and on behalf of all others similarly situated, | ) ) ) ) ) | CIVIL ACTION |
| | | No. 13-CV-02939-MEM |
| Plaintiffs, | ) ) | |
| | ) ) | Hon. Malachy E. Mannion |
| v. | ) ) ) | |
| | ) ) | Filed by Objectors and Prospective Intervenors |
| COMMUNITY BANK, N.A. | ) ) | |
| Defendant | ) | |

## BRIEF IN OPPOSITION TO MOTION FOR
## FINAL APPROVAL OF CLASS SETTLEMENT [1]

AND NOW COME Objectors and prospective Intervenors Urban, Sickler,

Laird, and Lenherr (collectively, "Objectors"), by and through their undersigned

counsel, who file this Response in Opposition to Motion for Final Approval of

Class Settlement, stating as follows:

### I.    THE CONFLICT AMONG THE SUBCLASSES
### PRIMARILY REVEALS A LACK OF ADEQUACY,
### AND SECONDARILY A LACK OF REASONABLENESS

Plaintiffs appear to harbor a fundamental misunderstanding of Objectors'

concern regarding the conflict among sub-classes.  They state in their Response to

---

[1] This brief replaces in entirety the pleading which was mistakenly filed on February 22, 2016, preserving all objections.

1

Objection of Nicole Urban and other Objectors (Doc. 128) (hereinafter "Brief"), that "the Objectors do not in their papers contest class certification under Rule 23. The Objectors do challenge whether the settlement is fair and reasonable." (*Id.* at 1-2). The second statement is correct, the first is not.

Fed.R.Civ.P. 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. Thus, a challenge to the adequacy of a representative plaintiff is a challenge to class certification under Rule 23. Concerning the issue of the intra-class conflicts present in this case, on June 8, 2015, Objectors wrote:

> Significantly, the allocation of the Settlement Fund creates an inherent conflict of interest among class members, which, in turn, calls into question the adequacy of the class representatives and renders the proposed Settlement suspect. In *In re Community Bank,* 622 F.3d 275, 305 (3d Cir. 2010), the Third Circuit framed the issue, apropos to the present matter, as follows:
>
> > As noted, the adequacy requirement is designed "to uncover conflicts of interest between named parties and the class they seek to represent." …. Here, there is an obvious and fundamental intra-class conflict of interest…the named plaintiffs' claims….are untimely, and they must rely on equitable tolling to save them. Notwithstanding that substantial hurdle to their claims, they seek to represent a sizeable subgroup of the class….with timely claims. *Cf. McAnaney v. Astoria Fin. Corp.,* No. 04–CV–1101, 2007 WL 2702348, at *12 (E.D.N.Y. Sept. 12, 2007)(holding that named plaintiffs in a TILA class action were inadequate representatives because their claims were time-barred).

[6]22 F.3d at 303. Applying the reasoning of the Third Circuit, <u>the</u> <u>*Brennan* representatives</u>, given their probable lack of standing, <u>are not</u> <u>adequate representatives of all the New York class members.</u>

(Doc. 90 at 10-11) (underline added) (footnote omitted).

Similarly, in their Objection to Approval of the Class Settlement (Doc. 100), Objectors explained that:

[A]s set forth below, this problem [the intra-class conflict] is more than merely an issue of the relative probability of recovery associated with the claims of various subclasses. More fundamentally, it involves a <u>serious question as to whether the Plaintiffs can fairly and</u> <u>adequately represent all three subclasses in this case, as required by</u> <u>Fed.R.Civ.P. 23(a)(4)</u>.

(*Id.* at 5) (emphasis added). After again discussing *Community Bank*, Objectors concluded that, "in the present case, there is no New York representative plaintiff whose claims are less than 3 years old. Without that, the existing representative plaintiffs cannot fairly and adequate represent the interests of the 'New York recent claim' subclass and approval of the proposed Settlement must be denied on this basis." (*Id.* at 6-7)

Accordingly, contrary to Plaintiffs' contention that "the Objectors do not in their papers contest class certification under Rule 23," Objectors' papers are replete with explanations of why Plaintiffs are not adequate representatives, which means the Class cannot be certified.

### A. This Settlement Cannot be Approved if Plaintiffs are not Adequate Representatives

Plaintiffs' exclusive focus on the alleged fairness and reasonableness of the settlement is improper. In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)), the Supreme Court "noted the special problems encountered with settlement classes. Although as a general matter it approved the certification of classes for settlement purposes only, the Supreme Court cautioned that the certification inquiry is still governed by Rule 23(a) and (b), and that '[f]ederal courts ... lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper.'" *In re Prudential Insurance Company Sales Practices Litigation*, 148 F.3 283, 308 (3d Cir. 1998); *See, also, In re Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 174 (E.D. Pa. 2000)(court "may not even reach the fairness question if there is not a proper class and may not substitute the fairness inquiry for the Rule 23(a) an (b) inquiry.").

### B. *In re Community Bank* is Directly on Point and Demonstrates that Plaintiffs are not Adequate Representatives

Although perhaps not recognizing its significance, Plaintiffs, nevertheless, try to distinguish *Community Bank* from the case at bar. They point out that in that case, the representative plaintiffs had claims that were older than the limitations period and relied on equitable tolling to save them from being time-

4

barred—concededly a long shot. Plaintiffs correctly point out that, in contrast, in the present case, the "old New York" claims are not unquestionably stale—because the New York limitations period is not settled. This is, however, the proverbial distinction without a difference.

It doesn't matter that in one case, the uncertainty as to the timeliness of the claim depended on the application of a tolling principle, while in the other it was due to doubt as to the correct statute of limitations. What counts is that, in both cases, the viability of the claim was unclear and this, in turn, rendered holders of such claims inadequate representatives of those whose claims did not suffer from this flaw. This Court should reject Plaintiffs' superficial distinction, hold that *Community Bank* controls here, and deny certification of the class.

Moreover, Plaintiffs have unintentionally conceded that the present Settlement runs afoul of *Community Bank*. First, Plaintiffs state that "[i]t is therefore possible (Class Counsel asserts otherwise, but it is certainly possible) that the Court agrees with the Bank that the statute of limitations is three years." (Brief at 6-7). They then continue: "In such a case, no New York Plaintiff would remain and that could doom recovery for the entire New York class of consumers, old and new." (Brief at 7). However, this is *precisely* what the Third Circuit held was a fatal conflict of interest in *Community Bank*. "Here, there is an obvious and fundamental intra-class conflict of interest…the named plaintiffs' claims….are

5

untimely, and they must rely on equitable tolling to save them. Notwithstanding

that substantial hurdle to their claims, they seek to represent a sizeable subgroup

of the class….with timely claims." 622 F.3d at 303.

Plaintiffs then formulate the following non sequitur: The New York

"recent" claimants are represented by Colino and Bellomo, who have claims that—

depending on the New York statute of limitations—might be time-barred. Because

their representative claimants' claims might be time-barred, the New York "recent"

claimants, have a lower probability of succeeding on their claims than do the

Pennsylvania claimants, and therefore, it is acceptable to discount the value of the

New York "recent" claims vis-à-vis the Pennsylvania claims.

The flaw in this reasoning is the notion that the diminished probability of
the New York "recent" claims succeeding justifies the reduced payment on those
claims. There is nothing *inherent* in the New York "recent" claims that makes
them any less likely to succeed than the Pennsylvania claims.[2] The only reason
these claims are less likely to succeed is *extrinsic* to the claim itself—i.e. the
weakness of the representative plaintiffs. However, far from justifying a
markdown of the claims, *Community Bank* teaches that such a defect in the claims
of the representative plaintiffs results in their failure to be adequate representatives
as required by Rule 23(a)(4).

The obvious solution to this fatal defect in the Settlement is to add a New

York representative plaintiff whose claim is less than 3 years old. Objectors have

suggested that Objector Eleanor Sickler is such an individual. Assailing this

---

[2] Notwithstanding Plaintiffs' tortured efforts to conjure something up. *See, infra*. Section
I. C.

6

suggestion as a "brash display of self-interest [that] should give the Court pause in considering the bona fides of—and the real motivation behind—these Objections" (Brief at 11), Plaintiffs cynically denounce this idea as merely an attempt by Ms. Sickler to obtain a representative service award. In order to dispense with this unwarranted disparagement, Ms. Sickler is willing to relinquish any entitlement to such an incentive award. An amended consolidated pleading would cure this fatal defect. Objectors' counsel will honor the attorney-fee allocation agreement made at the mediation on September 30, 2013. *See*, *infra.*, Section IV.

## C. Plaintiffs' Reasons for Discounting the New York "Recent" Claims are Transparent Rationalizations

In addition to arguing the non-applicability of *Community Bank*, Plaintiffs attempt to otherwise justify the disparity between the settlement's treatment of the Pennsylvania claims and the New York "recent Claims." They do this by ginning up some new reasons why all the New York claims, as distinct from only the old New York claims, have more risk than the Pennsylvania claims.

For example, Plaintiffs contend that New York's CPL 901(b) would bar New York residents from bringing a class action, like the present one, to recover statutory damages under Section 9-625 of the New York UCC. From this, they conclude that the claims of all New York residents are less likely to succeed and, therefore, are properly discounted vis-à-vis the claims of Pennsylvania residents. Quixotically, they take this position notwithstanding their concession that "CPLR

7

901(b)'s restriction on minimum recoveries does not apply to class actions [like the present one] brought in federal court pursuant to diversity jurisdiction." (Brief at 4).

Plaintiffs also argue that the New York claims are less valuable because there is no well-established body of New York law for the UCC claims, as there is under Pennsylvania law. This is patently false. *See, e.g. Coxall v. Clover Commercial Corp.*, 4 Misc.3d 654 (N.Y. Civ. Ct. 2004) (notices of repossession failed to provide all information required by UCC); *Ford Motor Credit Company, Inc. v. Racwell Construction, Inc.* 24 A.D.3d 500, 501 (N.Y. App. Div. 2005) (Plaintiff "bore the burden of establishing that all aspects of the sale of the vehicle were commercially reasonable (*see* UCC 9-626[a][2])"); *HSBC Bank USA, National Association v. Amagli*, 18 Misc.3d 139(A) (N.Y. Sup. Ct. 2008) ("plaintiff failed to establish that the notice of sale was reasonable (UCC 9-613) and that the vehicle, as collateral, was disposed of in a commercially reasonable manner."); *Mack Financial Corporation v. Knoud*, 98 A.D.2d 713 (N.Y. App. Div. 1983) (reversing summary judgment on deficiency claim in favor of lender, where lender failed to satisfy its burden of showing that sale was made in a commercially reasonable manner); *Central Budget Corp. v. Garrett*, 48 A.2d 825 (N.Y. App. Div. 1975)(creditor cannot obtain deficiency judgment in absence of showing that disposition was commercially reasonable).

Moreover, it is noteworthy that when they moved for Preliminary Approval of the Settlement, (Doc. 88) Plaintiffs relied *exclusively* on the disputed-limitations-period justification for the difference between Pennsylvania claims and New York recent claims (*Id.* at 13-14). Even after Objectors first questioned the validity of this explanation (Doc. 90 at 7-11), Plaintiffs stuck to their guns in their Supplemental Brief (Doc. 94) and insisted that the doubt about the New York limitations period is what made even those New York claims having absolutely no uncertainty as to timeliness, less valuable than Pennsylvania claims (*Id.* at 8-9). Similarly, the Class Notice mentions only the limitations justification. It is only now, when the weakness of their previous position has become obvious, that Plaintiffs have belatedly invented a series of post hoc rationalizations for the disparity.

## II.     THE POINTLESS ISSUANCE OF 1099-C's HARMS THE CLASS TO AN EXTENT THAT PREVENTS THE SETTLEMENT FROM BEING REASONABLE

### A.     The Holding in *Zarin*

Drawing another distinction without a difference, Plaintiffs contend that the Third Circuit's decision in *Zarin* is inapposite because it dealt with gambling losses, not financial institutions. As Objectors explained in their Objection, the holding in *Zarin* is that in situations where a taxpayer, in good faith, disputes the validity or amount of a debt, the amount of a subsequent settlement of the dispute

9

should be treated as the amount of debt cognizable for tax purposes and the excess of the original debt over the amount determined to have been due is disregarded for both loss and debt accounting purposes. In the present case, the settlement amount is zero and the "excess" is, therefore, the full deficiency balance, which must be disregarded. This analysis applies whether it involves a gambling debt, a defaulted car loan, or any other contested liability. The basis for this holding is the Third Circuit's holding that "[i]nstead of analyzing the transaction at issue as *cancelled debt*, we believe the proper approach is to view it as disputed debt or *contested liability*." 916 F.2d at 115 (emphasis added).

Relying on Treas. Reg. § 1.6050P-1(a)(3), Plaintiffs blithely argue that Objectors have confused the issue of what is includable in gross income with the issue of exclusions from gross income. Objectors have confused nothing. As quoted by Plaintiffs in their Brief, this regulation provides: *"[D]ischarged indebtedness* must be reported regardless of whether the debtor is subject to tax on the discharged debt under sections 61 and 108 or otherwise by applicable law." (emphasis added). However, Plaintiffs have apparently failed to grasp that this regulation does not apply, because, as set forth above, *Zarin* holds that what is at play here is not "discharged indebtedness," but rather, is the "settlement of a contested liability." Under *Zarin*, the Bank does not have a duty to issue 1099-C's.

## B. *Zarin* Controls Here

Plaintiffs' apparent criticism that that Objectors' position is based solely on the authority of *Zarin* completely misses the mark, because *Zarin* is the controlling authority here. *Thornwood Associates v. Greater New York Savings Bank (In re Thornwood Associates)*, 162 B.R. 438, 440 n. 3 (M.D. Pa. 1993) ("decisions of the Third Circuit are binding on this Court and we must apply the law as that court interprets it. We are not free to ignore Third Circuit holdings if we disagree with them."). Moreover, as set forth in the Objection, the contrary private letter rulings are not authoritative. This is because "there is no precedential value to private letter rulings and those rulings are not binding on any court." *In re Comp*, 134 B.R. 544, 556 (Bankr. M.D. Pa. 1991). "Title 26 U.S.C. § 6110(j)(3) provides that unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent." *Id*.

Plaintiffs argue that private letter rulings enable skilled tax practitioners to discern the IRS's views on issues. This statement, like the PRL's themselves, is irrelevant, because the IRS's view of this issue is not binding on this Court, while *Zarin* is. Plaintiffs have not and cannot cite to authority that instructs this Court to disregard controlling authority for non-precedential private letter rulings to discern the IRS's views.

11

Plaintiffs similarly point out that during the January 27, 2015 Status Conference, this Court remarked that it was not agreeing with Objectors' counsel on the 1099 issue. While true that in responding to Objectors' 1099 argument, the Court stated, "[w]ell, *I'm not sure* I'm buying your argument on that," the Court went on to made clear that "this is a status conference, so this is not a legal determination on my part." (Transcript at 28). Similarly, the Court remarked "....I don't agree with Mr. Shenkan's concerns, *off the top of my head.* (Transcript at 34). The Court's reluctance to express any stronger view of the law is appropriate, given that at that point it had not yet received any briefing on the 1099-C issue.

Either because they don't fully appreciate Objectors' argument regarding the 1099-C's, or because they are trying to mischaracterize it, Plaintiffs contend that neither they nor the Bank are responsible for the contents of the Internal Revenue Code and that neither party has the power to alter the tax regulations.[3] To be clear, Objectors' position is based entirely on the existing provisions of the IRS Code and implementing regulations. Objectors do not seek to make Plaintiffs or the Bank responsible for the applicable statutory provisions. They also do not need to

---

[3] Plaintiffs have truly missed the point when they cite *Clark v. C.I.R.*, T.C. Memo. 2015-175, 110 T.C.M. (CCH) 257 (2015) for the proposition that "the nonreceipt of a Form 1099-C, however, does not convert taxable income into nontaxable income." Objectors are concerned with the converse -- that the improper issuance of Forms 1099-C here, will effectively convert the nontaxable settlement of a disputed liability into a taxable cancellation of indebtedness.

change the regulations, only to follow them, consistent with their interpretation by the governing authority in this Circuit.[4]

### C. The Deficiency Balances are Unquestionably a Disputed Liability

Plaintiffs also refer to a Report by their expert, David Glusman, (Doc. 126-14). Therein, Mr. Glusman opines that the *Zarin* holding does not apply in this case, because the deficiency balances are not disputed and cannot, therefore, be the subject of the settlement of a contested liability, as was present in *Zarin*. He states that "'disputed debt' applies only to debt that isn't certain and where the dispute centers on the debt's validity or enforceability." (*Id.* at 5). He then continues, "[t]axpayers' debt isn't 'disputed' where they merely contest the amount of interest charged and never challenged the original amount of the debt." (*Id.*).[5]

---

[4] In similar litigation pending in state Court also involving a bank's alleged non-compliance with post-repossession notices sent to consumers, the Court recently entered an Order (attached hereto as Exhibit 1), in which it specifically adopted the controlling language of *Zarin v. Commissioner of Internal Revenue*, 916 F.2d 110 (3d Cir. 1990) and, accordingly, ordered that the defendant bank need not issue Form 1099-C's to the class ("FNCB Litigation"). In the FNCB Litigation, Attorney Cary Flitter (counsel for Plaintiffs in *Brennan*) and Attorneys Howard Rothenberg and Richard Shenkan (counsel for *Urban* and the Objectors in *Brennan*) joined forces to effectuate a global settlement.

Here, Flitter's priority is to thwart any additional benefit which Objectors could confer on the class instead of simply trying to seek the same tremendous benefit to this class as was accomplished in the FNCB Litigation – which *also* would significantly benefit Community Bank by insulating it from penalty. Prior to the beginning of the contested hearing, Objectors respectfully request the opportunity to meet with Your Honor and all counsel to discuss the viability of such a solution of an FNCB-like order.

[5] Mr. Glusman relies on *Exchange Security Bank v. U.S.*, 45 F.Supp. 486 (S.D. Ala. 1972). The Court should know that this decision was reversed by the 5th Circuit. *See*, 492 F.2d 1096 (5th Cir. 1974).

13

Mr. Glusman's opinion is inapplicable to the issue at hand, because both Objectors and the Brennan plaintiffs have disputed the validity and enforceability of the deficiency balances. In Count 3 of her Class Action Complaint, Objector Urban alleges that the deficiency balances are, in fact, void and that the Bank violated the FCEUA because it collected amounts from class members in respect of such unenforceable obligations. (*See, e.g.* Paragraph 75): "Upon information and belief, Defendant has (and continues to be) actively engaged in the collection of invalid deficiencies of Class Members, despite their [sic] knowledge that such deficiencies are exempt by law." One of the elements of relief sought in Count 3 is an injunction against the collection of such invalid deficiency balances.

Further, the Amended Complaint filed by Plaintiff Brennan in this case, contains multiple averments that the Bank's deficient notices were not commercially reasonable, resulting in a repossession and resale process that was not commercially reasonable. *See, e.g. Id.* at ¶¶ 52, 56, 87 and 92. The Brennan Amended Complaint further requests "such other and further relief as may be deemed just and proper" under Counts I and III (alleging defective repossession notices for the NY and PA classes), under which falls an injunction against the collection of invalid deficiency balances.

As set forth in her Brief in Support of Motion for Class Certification, the basis of Objector Urban's position that the deficiency balances are void is that the

14

defective repossession notices utilized by the Bank rendered each vehicle repossession and resale per se unreasonable. The Brennan Complaint also makes the claim that the repossession notices render the repossessions unreasonable.

It is well-settled under both Pennsylvania law and New York law that when a creditor violates the UCC and fails to act in a commercially reasonable manner as to *all* aspects of the sale of a repossessed vehicle, the value of the collateral is deemed to equal the indebtedness secured, thereby extinguishing the indebtedness. *Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 78 (1983); *Coxall v. Clover Commercial Corp.*, 4 Misc.3d 654 (2004). *Id.* at 11. Taking this position clearly represents a dispute as to the validity and enforceability of all of the deficiency balances and just as clearly brings this matter within the purview of *Zarin.*

As set forth above, under *Savoy* and *Coxall,* the Bank's failure to act in a commercially reasonable manner as to *all* aspects of the sale of a repossessed vehicle results in the value of the collateral being regarded as equalling the underlying indebtedness. This effectively voids the indebtedness under both Pennsylvania and New York law.

Thus, if Plaintiffs were to prevail on their argument that the notices were deficient, they would be entitled to extinguish the deficiency claims, relief that falls within their prayer for "such other and further relief as may be deemed just and

15

proper," as asserted in all four Counts of their Amended Complaint. Contrary to Mr. Glusman's opinion, the deficiency balances are obviously disputed, and, under *Zarin*, their settlement is not a "discharge of indebtedness." Plaintiffs are correct that "*Zarin* does not trump §6050P, nor does it purport to." (Brief at 22). What *Zarin* does accomplish is that it interprets Section 6050P, holding that it is inapplicable to the deficiency waivers in the present case because the liability is disputed.

Plaintiffs make much of the fact that the unjust enrichment claim in the *Urban* complaint is absent from their own Amended Complaint and that "the *Urban* case is not under review here." They will undoubtedly stake out the same position vis-à-vis her claim that the deficiency balances are void. Objectors have a clear responses to this myopic view: the classes in this case and in *Urban* are largely the same, so a claim asserted on behalf of the class in *Urban* has also been raised on behalf of the members of the class in this case.[6]

---

[6] The Bank's counsel informed the Court that "[T]he two classes in two actions essentially completely overlap not 100%, but they essentially overlap. So if I reach a resolution in the Brennen case, we will be coming to the Court with a stipulated class that Your Honor will have to approve. Your Honor will have to approve the terms of the settlement, but that would essentially preclude the Urban case from going forward as a class should Your Honor approve it." (Transcript of September 12, 2014 Case Management Conference (Doc. 66 at 7). If the two cases have an identity of classes for purposes of settlement, they certainly have an identity of classes for purposes of determining the claims asserted against the Bank.

## D. Plaintiffs (and the Bank) are not Really that Concerned About the Bank's Duty to Issue Forms 1099-C

At page 18 of their Brief, Plaintiffs explain that the reporting requirements for discharged debt under Section 6050P of the Internal Revenue Code and its implementing regulations are triggered by any of eight "identifiable events." They go on to state that the particular "identifiable event" that they believe obligates the Bank to issue 1099-C's to the Class in this case is one made "pursuant to an agreement between an applicable entity and a debtor to discharge indebtedness at less than full consideration," as set forth in 26 C.F.R. 1.0605P-1(b)(2)(i)(F). However, it is impossible to understand how they (or, for that matter, the Bank) can take this position, given that the Settlement Agreement, itself, specifically provides that "[n]othing in this Agreement shall be construed as creating a cancellation of debt or of itself giving rise to an 'identifiable event' under *inter alia* the Internal Revenue Code or Treasury Regulations, §1.6050P." (*Id*. at 36, Section 7.11(a)). This Court's approval of the Settlement would ratify this no-identifiable-event provision, after having previously approved a class notice that informs the members of the class that "the Settlement Administrator expects to inform the Internal Revenue Service ("IRS") about the amount of your Auto Loan Deficiency waived (if more than $600 is waived)." (*Id*. at 5, Answer to Question 13).

It is quite likely that debt forgiveness pursuant to one of the other "identifiable events" has occurred with respect to many class members in tax years

17

*prior* to 2016, the presumed date of the Settlement of this case. Based on conversations with the Bank's counsel, the Bank has yet to issue any Form 1099-C to any class members, apparently, working under the assumption that, to date, no triggering "event" for debt-forgiveness has occurred.

If the Bank failed to issue Forms 1099-C in prior years despite the existence of triggering events, then the deficiencies of perhaps hundreds of class members, have already been forgiven. The statute of limitations for IRS assessments is three (3) years after the return was filed. Therefore, if the class member failed to report the cancellation of indebtedness (when such was due) in 2008, 2009, 2010, 2011 or 2012, then the statute of limitations for the IRS to collect the tax has likely lapsed.

In this regard, a huge number of class members will have a valid defense to a tax claim that is based on a pre-2016 debt forgiveness event, even though no Form 1099-C was issued for that tax year. In contrast, if the Bank were to issue, in blanket-form, Form 1099-Cs to all class members for tax year 2016, despite fact that the debt that was actually forgiven in 2008-2012 when the 1099-C should have been sent, the class member is unnecessarily harmed because s/he will be inordinately more difficult for the class member to assert the 3-year limitations period as a defense.

As set forth above, Objectors believe that the Bank should not be issuing 1099-C's in connection with the deficiency waivers, at all. However, if the Court holds that it is proper for the Bank to issue them, it is Objectors' position that the Bank must issue the Form 1099-C's for the tax year when the triggering event actually occurred – as clearly required by regulation. To do otherwise would be to unnecessarily deprive class members of a potentially valid defense to a stale-dated tax assessment and/or to be faced with a tax when such tax is (or was) not due. This additional step is easily effectuated by the Bank as the stage of collection efforts, payments received, or the lack of any collection / payment activity is readily ascertainable.

> The existence of an individual inquiry does not preclude class treatment where all class members face the necessity of proving the same fraudulent scheme. *See, e.g., Amchem,* 521 U.S. at 625, 117 S.Ct. 2231 (stating that even though mass accident cases are likely to present significant individual questions of liability and damages, such cases "may, depending upon the circumstances, satisfy the predominance requirement"). *In re Sch. Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986). This is even more true in a settlement-only class action, where the court certifying the class need not examine issues of manageability. *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231.

*In re Community Bank of Northern Virginia*, 418 F.3d 277 (3rd Cir. 2005).

The net result of not doing this – potentially hundreds of class members will be assessed a tax *for the wrong year*. Approving this settlement, in its present form, will likely deprive class members of their defense to a tax liability and, in effect, serve to ratify potentially improper procedures of the Bank relating to the issuance

19

of 1099-C forms. Sending blanket 1099-C's to all class members serves to immunize the Bank from liability while burdening class members with the challenge to defend against a tax which they don't owe.

### E.    A Settlement in which 1099-C's are Issued is Unreasonable

As set forth above, this Court may not even reach the question of the fairness and reasonableness of the Settlement if the requirements of Rule 23 have not been satisfied. *Prudential Insurance Company Sales Practices Litigation*, 148 F.3 283, 308 (3d Cir. 1998).  Thus, Plaintiffs' contention that the Settlement is reasonable even if the Bank issues 1099-C's, is relevant if and only if they can overcome the problem with the adequacy of their representative plaintiffs.  However, even if it is relevant, it is wrong.

As explained above, pursuant to the controlling authority, the Bank will have no obligation to issue 1099-C's as part of the settlement.  The issuance of these forms will result in an aggregate income tax liability for the class amounting to approximately $2 million dollars (applying the 15% tax rate [7] of $13.85M of deficiency balances) because, by the issuance of 1099-C's, the Bank will have classified the deficiency amounts as "cancelled debt" subject to taxation rather than

---

[7] The 15% tax rate applies to single, individuals with taxable income from $9,276 to $37,650; married, filing jointly from $18,551 to $75,300; married, filing separately from $9,276 to $37,650; and head-of-household from $13,251 to $50,400. Objectors' counsel reasonably believes that the majority of class members are at this tax rate.

"disputed debt" not subject to taxation. Additionally, the class members will likely have to pay hundreds of thousands of dollars in fees to hire tax professionals to defend against the improper categorization (via the 1099-C's) of the untaxable settlement of disputed liability as taxable cancellation of debt. The Bank's non-issuance of these forms would provide a $2 million benefit[8] to the class, *at no cost whatsoever to the Bank*. It is Objectors' position that any settlement that provides for the issuance of these forms in the face of the foregoing reality is *per se* unreasonable.

Again, the easiest and most effective way for *all* parties to avoid this tax issue would be for the Court to issue an order acknowledging that the deficiency is, indeed, a disputed debt, as was done in the FNCB litigation.

## III.   OBJECTORS' BENEFITS TO THE CLASS ARE PALPABLE

### A.   It is Specious for Plaintiffs to Contend that Objectors are not Responsible for the Present Opt-Out Structure for the Deficiency waivers

Plaintiffs dispute that Objectors should get any credit for benefitting the class in connection with the change in the structure of the deficiency waiver benefit from an opt-in provision to an opt-out benefit. First, they contend that the Objectors had nothing to do with this change, that it was the Court that was

---

[8] This estimate does not account for the existence of class members that might avoid tax liability as a result of insolvency or bankruptcy discharge.

responsible for it and that "[i]t is merely fortuitous that the Urban Objectors happen to agree with the Court on this point." (Brief at 25). To support this position, they extensively quote the Court's comments during the January 27, 2015 hearing, discussing the reasoning behind the switch to an opt-out structure. (Brief at 25-6, *quoting* transcript at 34-5, 43.)

However, contrary to Plaintiffs' contention, the quoted language does not show that the Court initiated the switch. Rather, when read in the context of the entire transcript, it shows that by that point in the hearing, Objectors' counsel had persuaded the Court of the wisdom for such a switch. Starting at the bottom of page 17 of the transcript and continuing to page 26, the Court, the Bank's counsel and Objectors' counsel have a discussion, during which Objectors' counsel explains his concerns with the existing opt-in set-up.

> THE COURT: Tell me what the remaining concerns are. Now I'm not talking about the formatting of the notice, okay, I'm talking about, tell me what the substantive concerns - - I understand there's the 1099, whether it needs to or doesn't need to be issued by the bank is a concern, right?
>
> MR. SHENKAN: Yes, Your Honor.
>
> THE COURT: Debt forgiveness. I'm not quite understanding. The bank says, We're willing to give debt forgiveness. So what's the issue there?
>
> MR. SHENKAN: The issue is this: if I can do it illustratively, because I think that's the easiest way to do it.
>     If a class member gets the notice and does nothing with the notice, just throws it in the garbage, that class member, let's assume if

that class member is in the four-year statute back in New York is going to get a check for $287, $300 approximately. If that person has a deficiency judgment [sic] of $7,000, the bank can then sue them.

(Transcript at 17-18).

THE COURT: Is he [Objectors' counsel] correct? Can you make a determination that, after you've gotten you check for 200 or 500, I don't care what the number is, that you've got an outstanding balance, even though we have corrected it, we are now going to sue you for that?

MR. FELLOWS: Correct, Judge. It's optional for the class member, whether they want to exercise their right to that benefit.

(Transcript at 23).

THE COURT: So you don't get it [debt forgiveness] unless you opt in?

MR. FELLOWS: Correct.

THE COURT: You get the other two, but don't get debt forgiveness unless you opt in?

MR. FELLOWS: Yes.

THE COURT: So those that decide not to opt in, meaning, that they don't even affirmatively decide to opt out, they just don't - - they throw it away, they don't opt in, then, those people are not getting debt forgiveness and not getting a 1099 from the bank, and so the bank, in theory, could sue those people?

MR. FELLOWS: Absolutely, Judge.

THE COURT: So Mr. Shenkan's original statement that someone gets a check for whatever, and then they accept the check, and the bank can come back and sue them for whatever the balance is on the deficiency, if they threw it away, if they haven't affirmatively opted in?

MR. FELLOWS: Correct.

THE COURT:       All right.  I see a problem with that.  Next.  What's the next issue?

(Transcript at 25-6).

Inasmuch as Plaintiffs' counsel was present at the hearing when the foregoing discussion took place, it is unclear what could possibly be the basis, besides baldly attempting to discredit Objectors, for Plaintiffs' claim that it is merely fortuitous that Objectors happen to agree with a conclusion already reached by the Court.[9]

### B.    The Opt-In / Opt-Out Switch is a Multi-Million Dollar Benefit to the Class

Plaintiffs claim that Objectors have "provided no evidence of the effect of anything they did." (Brief at 27).  Having shown that Objectors were the driving force behind the opt-in/opt-out change, it remains only to quantify the benefit in order to complete the refutation of Plaintiffs' contention.  This is easily done.

It is well-known that response rates for class members are generally quite low.  *See, e.g.* Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt–Outs*

---

[9] Even the Bank gives credit where credit is due and acknowledges that Objectors caused this improvement in settlement.  "Initially, counsel for Ms. Brennan and Community Bank negotiated a settlement in which class members would have to affirmatively elect debt forgiveness....Attorney Shenkan objected to this provision, and insisted that all class members should be afforded debt relief.  Following a conference with the Court, Community Bank and Ms. Brennan agreed to modify this term." (Bank Brief (Doc. 127) at 10).

*and Objectors in Class Action Litigation: Theoretical and Empirical Issues* (Mar. 23, 2004) (unpublished manuscript) (testing scholars' conclusions against empirical data and reporting that "[o]pt-out rates vary by case type," with consumer class actions having a relatively low mean opt-out rate of less than 0.2 percent).

The class notice in this case states that the aggregate deficiency balance across all members of the class is $16,326,236. (*Id.* at 4). If the original opt-in structure had remained, it could conservatively be expected that only about 15% of the class would have opted in, leaving approximately 85% of the class not receiving this benefit.[10] The value of the deficiency waivers lost by this group of class members is approximately 85% of $16.3 million which is $13.85 million. By switching to an opt-out structure for the deficiency waiver, it likely recaptured this $13.85 million in deficiency waivers for the benefit of the class and resulted in the Bank's agreement not to sue class members for deficiencies.[11] This is the approximate value of the benefit to the class resulting from the change in the settlement that was urged by Objectors.

---

[10] The Court could assume a response rate of 10% or 30%, just as well. It does not alter the fact that a large majority of the class was benefitted by the change to an opt-out.

[11] Plaintiffs fail to acknowledge the additional benefit conferred on class members that they will now not be sued by Community Bank. Compare, the opt-in structure agreed-to by Brennan's counsel which expressly permitted the Bank to sue class members for the deficiency balances. See Doc. 90, incorporated herein.

## C. The Opposition to the Opt-In Feature has been Consistent

In a further effort to convince the Court that Objectors should be given no credit at all for this improvement in the Settlement, Plaintiffs claim that Objectors had originally agreed with the deficiency waiver opt-in provision, and had subsequently "flip-flopped." This is simply not true.[12] From the very first time Objectors were aware of the opt-in provision, they opposed it. During the January 27, 2015 status conference, Plaintiffs' counsel recounted to the Court that right after the mediation with Judge Welsh, he spent 10-12 days drafting the settlement documents and then sent them to Objectors' counsel for review. About 10 days later, he had a conference call with them (Transcript at 10-11), during which:

> They voiced some concerns about the substantive issues and about some lesser issues. They voiced some concern about, for example, the physical appearance of the election form and some of the language in CINTAX that was used. *But at that point, they raised an issue about whether it should be, you know, an opt in or opt out. And by that, of course, I'm referring to the debt waiver…..*

(Transcript at 11). (emphasis). (Transcript excerpts Exhibit 2).

---

[12] To support this incorrect contention, Plaintiffs cite a footnote in Document 72 filed by Plaintiffs. That footnote is nothing more than Plaintiffs assertion that Objectors do not wish to be a party to the settlement as then constituted—i.e. with the opt-in provision. In the absence of showing that Objectors had previously agreed with the deficiency waiver opt-in, this hardly shows any "flip-flopping."

Thus, it is crystal clear that from the very first time they saw a draft of the settlement agreement containing the opt in provision, up to the present day, Objectors have *consistently* opposed it. There has *never* been a flip-flop.

### D. Whether they are Considered "objectors" or not, Objectors have Conferred a Benefit on the Class with the Opt-In / Opt-Out Switch

Plaintiffs also cite *In re Cendant Corp. Securities Litigation*, 404 F.3d 173 (3d Cir. 2005) for the proposition that simply doing work on behalf of the class does not create a right to compensation. However, the complete sentence in the Third Circuit's opinion from which Plaintiffs plucked this sentiment is: "The cases are unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether that work provided a benefit to the class." (*Id.* at 191) (italics in original) (underline added). In context, the proposition is not as Plaintiffs assert. Additionally, as discussed above, by any measure, Objectors have already provided a significant benefit to the class.

Plaintiffs go so far as to argue that Objectors don't get credit for the opt-in switch, because Urban was not an objector at the time the Court considered the Motion for Preliminary approval on January 27, 2015. Although not stated, it appears that Plaintiffs assume—without any support—that one cannot benefit a class unless one has filed a written objection. Plaintiffs are wrong.

The substantial benefit doctrine enunciated in *Mills v. Elec. Auto–Lite Co.,* 396 U.S. 375, 393 (1970), entitles counsel who confer a benefit on an ascertainable group through litigation efforts to the payment of attorneys' fees, even if that benefit is realized in a different action. *See, e.g., In re Linerboard Antitrust Litig.,* 292 F.Supp.2d 644, 668–69 (E.D.Pa.2003) (court prospectively sequestered a percentage of funds from future settlements or judgments in tag-along actions to compensate class counsel for the substantial benefits the tag-along plaintiffs would obtain from class counsel's work); *Joy Mfg. Corp. v. Pullman–Peabody Co.,* 729 F.Supp. 449, 453 (W.D.Pa.1989) ("where [a] party has by his or her effort and expense through litigation created a benefit for others a fee award is appropriate whether or not the litigation is mooted before judgment and regardless of whether there is a monetary fund created from which fees may be paid."). Accordingly, Objectors' alleged "non-objector status" is no impediment to their receiving credit for the benefit that have brought to the class.

Similarly, Plaintiffs claim that Objectors have clouded, rather than sharpened the issues by challenging, without basis, the merits of the settlement. Inasmuch as the Court, itself, appears to have adopted Objectors' position on the

opt-in/opt-out issue,[13] Plaintiffs are hard-pressed to characterize that position as being "without basis."

### E. Objectors' Efforts have Resulted In Additional Benefits to the Class

Although more difficult to quantify its value, the reference to IRS Form 982 in the Class Notice is also attributable to Objectors. That form is the mechanism by which a taxpayer notifies the IRS that he/she is insolvent, and therefore not liable for taxes on discharged debt. It was Objectors that first suggested the reference to this Form (Transcript at 29). In terms of benefit to the class, notifying class members of this form is a distant second to preventing the issuance of 1099-C's, but is nevertheless of great value if the 1099-C's are issued. *See*, Supplemental Affidavit of John McGovern (Doc. 100-3 at 2, ¶ 4), incorporated herein.

Additionally, the class has been benefitted by Objectors' having pointed out that, in the first instance, co-borrowers had not been sent class notices. Plaintiffs attempt, in multiple ways, to minimize the importance of this benefit. First they claim that this issue is now moot because supplemental notices were, in fact, sent to 652 co-borrowers, a significant fraction of the class. The fact that it is now moot, does not in any way diminish its value to the class. After all, the opt-in /

---

[13] In Plaintiffs' own words: "the Court's strong preference for presumptive debt forgiveness." (Brief at 26)

opt- out switch is now moot, as well, and the value of that change to the settlement is undisputed.

Second, they claim that Objectors could have simply contacted plaintiffs' counsel shortly after the August 4, 2015 mailing to correct the problem. However, Objectors counsel did not become aware of this error until they learned that their co-borrower client had not received class notice, which was not shortly after the mailing.

Finally they claim that this correction did not increase the common fund. This contention not only ignores the value of correcting the due process flaw in the Settlement engendered by this error, but it ironically disregards that Plaintiffs, themselves, have taken credit for "over $16.3 million in debt forgiveness, and valuable credit report correction" (Doc. 126 at 36),[14] neither of which increases the common fund, either.

### F. The *Urban* Case Increased the Settlement Fund at Mediation

At the mediation, the Bank agreed to pay more money towards settlement as a result of the Bank's understanding that the *Urban* matter would be settled with the *Brennan* matter. Community Bank's counsel, explained: "In mid-afternoon, Judge Welsh came to me with a number and said, This is basically Plaintiff's

---

[14] The $16.3 million of debt forgiveness would have been considerably less, were it not for Objectors' insistence on an opt-out provision.

30

bottom line, and if you can get there, Mr. Shenkan has signed off on that number. I didn't ask her where that information came from, she gave it to me. I said, We're pleased, *this allows us, maybe, to negotiate a little further, because Mr. Shenkan is in, and we reached a settlement at 2.8 that afternoon.*" (See, Transcript at p. 10, l. 4-11). Only days after the mediation, Plaintiffs' counsel disclosed to the Objector's counsel the troublesome deficiency waiver feature which expressly permitted the Bank to sue (and continue litigation against) class members for deficiencies despite settlement.

Plaintiffs' position that Objectors have brought no benefit to the class is untenable.

## IV. OBJECTORS ARE ENTITLED TO AN AWARD OF ATTORNEY FEES

The Settlement Agreement that the Court has preliminarily approved provides for the payment of attorney fees from the Settlement Fund in an amount not to exceed $1.092 million dollars. As part of their Motion for Final Approval, Plaintiffs' Counsel has sought to be paid the entirety of that amount.

For the reasons set forth above and in their Objection to Approval of Class Settlement (Doc. 100), Objectors believe that the Settlement in this case should not be approved. If the Court, nevertheless, enters an Order approving the Settlement, that Settlement will have been significantly improved through the efforts of Objectors. In that event, Objectors believe that these benefits should entitle

31

Objectors to a share of the common fund and agree to limit their fees to a reasonable share of those attorney fees which Plaintiffs' counsel has now claimed exclusively for themselves.

As was reported to the Court during the January 27, 2014 Status Conference, Plaintiffs' and Objectors' counsel initially agreed to an allocation of the gross attorney fees on a percentage basis, as between them at the mediation of September 30, 2014. (*See* Transcript at 5, 7). The agreed-to allocation was 80% to Brennan's counsel and 20% to Urban's counsel. The Court should note that this agreement preceded the switch precipitated by Objectors, from an opt-in for the deficiency waiver to an opt-out, which represents an additional significant benefit to the Class for which Objectors are responsible, likely approximately an additional $13.8M in additional benefit conferred on the class plus the extinguishment of the Bank's right to sue class members. Notwithstanding that substantial change in circumstances, Objectors will honor the 20% percent share of the gross attorney fees awarded, as was agreed, along with reimbursement of costs. If Plaintiffs' counsel continue to maintain that the Objectors should not receive the agreed-to allocation, then Objectors respectfully request that the Court bifurcate the attorney fee issue and escrow all attorney fees and costs for a subsequent adjudication relating solely to attorney fees. Objector's counsel agree to do whatever is

32

reasonably necessary to ensure that the attorney-fee issues are not intertwined with

the resolution of the substantive class issues.

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.

_____
Richard Shenkan
P.O. Box 7255
New Castle, PA 16107
T: (800) 601-0808
F: (888) 769-1774

Howard Rothenberg
Howard Rothenberg and Associates
345 Wyoming Ave., Suite 210
Scranton, PA 18503
T: (570) 207-2889
F: (570) 207-3991

*Attorneys for Nicole Urban and Other Objectors / Prospective Intervenors*

## CERTIFICATE OF SERVICE

I certify that all parties' counsel subscribe to the ECF system and, as such,
received notice of this pleading on February 23, 2016.

SHENKAN INJURY LAWYERS, LLC.

_____
Richard Shenkan
*Attorneys for Nicole Urban and Other Objectors / Prospective Intervenors*